# EXHIBIT D

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Wells Fargo Bank NA,** | ) | |
| | ) | No.  **CV-17-4140-PHX-DWL** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | April 8, 2019 |
| **Wyo Tech Investment** | ) | 1:29 p.m. |
| **Group LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                          **A P P E A R A N C E S**

3

For Defendants CWT Canada, Resources Recovery Corporation and
4   Jean Noelting:
        Ryan Rapp & Underwood
5       By:  **James Hendrik Taylor,** Esq.
        3200 North Central Avenue, Suite 2250
6       Phoenix, Arizona 85012

7       Schlam Stone & Dolan
        By:  **Joshua Wurtzel,** Esq. (Telephonically)
8       26 Broadway, Suite 1900
        New York, New York 10004
9
For Defendant Wyo Tech Investment Group:
10      Wilenchik & Bartness
        By:  **Chase Reddeford Turrentine,** Esq.
11      2810 North 3rd Street, Suite 103
        Phoenix, Arizona 85004
12

13

14

15

16

17

18

19

20

21

22

23

24

25

—— CV-17-4140-PHX-DWL – April 8, 2019 ——

1        (Proceedings begin at 1:29 p.m.)

2        THE CLERK:  Civil case 17-4140, Wells Fargo Bank NA

3    versus Wyo Tech Investment Group LLC and others.  Time set for

4    hearing regarding defendants' motion to dismiss, motion for

5    judgment on the pleadings, defendants' motion to enjoin CWT          13:29:56

6    parties from attempts to utilize New York restraining notices,

7    and joint discovery dispute.

8        Counsel, please announce your presence for the record.

9        MR. TURRENTINE:  Chase Turrentine for Wilenchik and

10   Bartness.                                                            13:30:11

11       THE COURT:  Good afternoon.

12       MR. TAYLOR:  Good afternoon, Your Honor, Hank Taylor,

13   local counsel for the CWT parties; CWT Canada, Resources

14   Recovery, and Jean Noelting.

15       THE COURT:  Good afternoon.                                      13:30:19

16       MR. WURTZEL:  Good afternoon, Your Honor, this is

17   Josh Wurtzel from Schlam Stone & Dolan for the CWT parties as

18   well.

19       Thank you for accommodating me from New York.

20       THE COURT:  Yeah, no problem.                                    13:30:30

21       Can you repeat your last name?

22       MR. WURTZEL:  Sure.  This Joshua Wurtzel,

23   W-U-R-T-Z-E-L.

24       THE COURT:  Okay.  Thank you.

25       So we are set today because as the parties know there            13:30:40

CV-17-4140-PHX-DWL – April 8, 2019

1    are an array of different things pending before the Court.

2    There is a -- Wyo Tech's motion to dismiss, which is at docket

3    number 95.  There's Wyo Tech's emergency motion for an

4    injunction, which is at docket number 98, which in their reply

5    they narrow to as far as I can tell only a request for          13:30:59

6    reconsideration of the Court's previous ruling on personal

7    jurisdiction.  There is also the discovery dispute concerning

8    the subpoena to the Wilenchik firm and to Beus Gilbert, which

9    is at docket number 101.

10           I issued a somewhat lengthy order at docket number 109  13:31:18

11   laying out some of what I think are the unresolved issues in

12   the case.  And since then the parties have filed supplemental

13   briefs at 113 and 114.

14           So there's a lot of stuff out there.  I feel like I

15   have a pretty good handle on how everything fits together, but  13:31:33

16   I'm very interested in hearing the parties' perspectives on

17   things.

18           So my understanding, Mr. Turrentine, is that you have

19   an electronic presentation; is that correct?

20           MR. TURRENTINE:  No, just verbal.                       13:31:47

21           THE COURT:  Okay.  So, I guess I'll start,

22   because -- I guess we could have either side go first, but

23   because some of the things before me are motions that were

24   filed by Wyo Tech, I'll start with Wyo Tech.

25           So please proceed however you'd like.                   13:32:06

1          MR. TURRENTINE:  Thank you.

2          And I apologize, I have a very loud voice, I'm going

3     to try to not blow out any speakers here.

4          THE COURT:  No problem.  Thank you.

5          MR. TURRENTINE:  So in your most recent minute entry          13:32:21

6     and order, that very lengthy one you just described, you laid

7     out a lot of the case law.  If you want me to go over the facts

8     of the case at any point, let me know.  But otherwise, I'd like

9     to just kind of proceed in the order that you described them;

10    the motion to dismiss slash motion for judgment -- sorry,          13:32:37

11    motion for judgment on the pleadings, the motion to enjoin CWT

12    parties, and then the discovery dispute.

13         THE COURT:  Okay.  Sure.

14         MR. TURRENTINE:  Great.

15         So, the sole issue in the case has been, uncontested,        13:32:48

16    that it's whether or not Danzik has an interest in the funds in

17    dispute.  However, a lot of the issues that have come up since

18    then have been whether or not the funds were rightfully

19    restrained by the CWT parties.  And that's the crux of the

20    issue for the motion to dismiss and the motion for judgment on   13:33:11

21    the pleadings.

22         Essentially we've argued that in -- or it's been

23    stated that in instances where there are similar parties,

24    similar issues, similar facts at stake, it's important for the

25    issues of judicial economy and to avoid horizontal --            13:33:28

CV-17-4140-PHX-DWL – April 8, 2019

1   horizontal appeals that would take judicial notice that in

2   Federal Court and Bankruptcy Court in Wyoming, this issue was

3   litigated.  It was argued.

4        And the -- and the judge in the Wyoming Bankruptcy

5   Court stated that it was, quote, speculative, conclusory, and    13:33:48

6   would not survive a motion to dismiss.

7        On those grounds we would ask that you take judicial

8   notice of that and preclude any further arguments in that

9   matter.

10        Now the CWT parties have made a few counter arguments      13:34:06

11   to try to differentiate it.  They cite the law of case

12   doctrine, which essentially says that, oh, well, if you request

13   the same relief over and over again, you should be excluded

14   from doing that.

15        That cites a case *Meadowgate,* and *Meadowgate* is        13:34:23

16   citing --

17     (Court reporter interruption.)

18        MR. TURRENTINE:  Sorry.  That's one of the many

19   critiques of my public speaking.

20        In *Meadowgate* they cite *U.S. v. Garcia,* which further   13:34:35

21   illuminates the issue and states that, first, the doctrine of

22   case law is discretion.  And it seems practical for why that

23   would be.  The only issue -- the only thing at issue

24   here -- the only relief we're going to request is that the

25   funds be released.  It's going to be a consistent theme that    13:34:55

1    we'll be seeing throughout all the motions, and has been.

2           Further, in addition to it being discretionary, it

3    should be -- it shouldn't necessarily be followed if the

4    decision is clearly erroneous, or its enforcement would work a

5    manifest injustice.                                    13:35:14

6           Our position is that the use of the New York law, for

7    which none of the parties that have been restrained have any

8    reasonable contact with, minimum or otherwise, that it is a

9    manifest injustice to allow this to continue.

10          Which kind of leads me into the next motion, which is   13:35:32

11   the motion to enjoin, if that's okay.

12          THE COURT:  Sure.

13          MR. TURRENTINE:  So we're requesting that CWT parties

14   be restrained -- or be enjoined from using the New York

15   restraining notice under C.P.L.R. 5222.                 13:35:50

16          The grounds for that are multiple fold.

17          THE COURT:  Let me just pause you right there.

18          MR. TURRENTINE:  Yeah, sure.

19          THE COURT:  Because you filed a motion to enjoin, and

20   that was one of the categories of relief you sought in the   13:36:03

21   motion.  Then you filed a reply brief, it's at docket number

22   110, in which you said, quote, Wyo Tech withdraws the portions

23   of its motion that do not relate to its request that this Court

24   reconsider its ruling regarding personal jurisdiction.

25          MR. TURRENTINE:  At 110?  My apologies.  Then I will   13:36:22

1    skip over that portion.

2            If you'll allow me to minute to collect my thoughts.

3            THE COURT:  Yeah, no problem.

4            MR. TURRENTINE:  So, as far as the personal

5    jurisdiction matter, setting that aside, the CWT parties did          13:36:45

6    not comply with 5222.  The statute itself states that --

7            THE COURT:  What are you talking about now, are you

8    talking -- when you said they didn't comply, are you talking

9    about the restraining notice that was issued to Wells Fargo to

10   get the Wyo Tech account, or are you talking about the seven        13:37:09

11   recent ones that were the subject of the motion to enjoin?

12           MR. TURRENTINE:  They are both -- they're all

13   interconnected, so the argument applies across the board.  But

14   I'm specifically discussing the earlier one in 2017 that kind

15   of gave rise to these proceedings.                                   13:37:23

16           THE COURT:  Okay.

17           MR. TURRENTINE:  The state -- or the statute states

18   that -- and I'll pull it up so I can quote it exactly.

19           THE COURT:  I just -- are you still -- are you talking

20   about personal jurisdiction now or are you moving on to the         13:37:36

21   third issue?

22           MR. TURRENTINE:  No, I'm arguing that even though

23   they -- if they have personal jurisdiction, that they didn't

24   comply with the law in the first place, and it should,

25   therefore, be enjoined from utilizing that against the clients,     13:37:51

CV-17-4140-PHX-DWL – April 8, 2019

1   against my client.

2        THE COURT:  Okay.  And so I want to be really clear on

3   what issue we're talking about now.  First you started with the

4   motion for judgment as a matter of law because the Wyoming

5   ruling is collateral estoppel.                                    13:38:03

6        MR. TURRENTINE:  Correct.

7        THE COURT:  Then we moved on to the next pending

8   motion, which is the motion to enjoin, which we've now

9   established you've withdrawn your request to enjoin them from

10  the issuance of the most recent restraining notices.  And the   13:38:16

11  only relief that's requested in that motion is for the Court to

12  reconsider its previous ruling that the Court lacked personal

13  jurisdiction with respect to Wyo Tech's cross claims and

14  counterclaims.

15       There's an entirely separate set of issues which is,       13:38:31

16  on the merits, what do we do with the restraining notice that

17  was issued to Wells Fargo for the Wyo Tech account, and how

18  does that relate to the three interrelated issues in my order.

19       What issue are you arguing right now?

20       MR. TURRENTINE:  Well, I came prepared to argue            13:38:46

21  several, but with Dennis Wilenchik being out of the country, I

22  kind of jumped in at the last minute.  So I apologize that

23  there was that confusion.

24       So the remaining issue is personal jurisdiction, is

25  that the consensus here?                                          13:39:01

CV-17-4140-PHX-DWL – April 8, 2019

1    THE COURT:  You have a motion asking me to reconsider

2  my prior personal jurisdiction analysis.  It's not clear to me

3  what the validity or invalidity of the original restraining

4  notice to Wells Fargo has anything to do with that.  Because

5  the only ground you've asked me in your papers to reconsider          13:39:21

6  that ruling is based on what happened with the more recent

7  round of restraining notices.

8    So if your arguments right now are about the initial

9  one, concerning the Wyo Tech account, it's not clear to me why

10  that's related to personal jurisdiction.                             13:39:34

11    MR. TURRENTINE:  Understood.  Then moving on to the

12  seven later ones.

13    THE COURT:  Okay.

14    MR. TURRENTINE:  The idea there that -- so, the

15  accounts that were restrained in February, the accounts of         13:39:49

16  IEC -- Inductance Energy Company -- Wilenchik and Bartness, and

17  then several Danzik related parties, in that none of those

18  parties have had any -- any interaction with the forum state of

19  New York.  That's one of the fundamental problems.

20    There have been case law cited, such as the *North*              13:40:15

21  *Mariana* -- I hadn't said that out loud yet -- the *North Mariana*

22  case that's cited in the briefing, that says, oh, well, we can

23  restrain some of these funds from -- for people who are outside

24  of the forum state, which is New York.

25    There's several distinguishing factors in that case            13:40:32

UNITED STATES DISTRICT COURT

1   though.  Namely, that the judge recognized that the parties who

2   were restrained never pointed out that any harm had been done.

3          Further, the bank that was -- where the funds were

4   being held was a New York bank, it was Merrill Lynch, which is

5   headquartered in New York.  So there is a more significant        13:40:52

6   connection to those.

7          In the case at hand we have Wells Fargo, which is the

8   bank where all the funds were restrained, which is

9   headquartered out of California -- San Francisco specifically.

10  We have Wilenchik in Bartness, which is not out of a New York    13:41:07

11  bank.  And we have Bank of the West, which is, by its name, out

12  west.

13         So the -- there should be no -- they've not availed

14  themselves of the forum state laws.  There haven't been any

15  minimum connections.                                             13:41:23

16         To allow -- to allow CWT parties to reach across state

17  lines to such a degree that, as they argue, if the parties

18  didn't wish to be subjected to the New York law, then they

19  should have selected a bank that didn't have any business or

20  branches in New York, I think is patently disingenuous.          13:41:42

21         Anytime somebody opens a checking account,

22  we -- nobody's considering, oh, well, how many states are they

23  in?  Which states are they in?  And if all the business is done

24  locally in the local state -- in this case it was done out of

25  the Scottsdale branch here in Arizona -- they have not availed   13:42:01

1    themselves and, therefore, New York law should not be able to

2    reach across state lines to this degree.

3          And the reason that the New York law was selected here

4    is because it's uniquely situated to advantage the judgment

5    creditors in the action.  And that's part of the C.P.L.R. 5222,    13:42:23

6    which allows essentially the judgment creditor's attorney to

7    act as a member of the court and issue a restraining notice and

8    seize the funds across state lines, which is something that

9    could not happen if they had utilized the correct forum, which

10   they've -- they've localized the judgment, utilizing the          13:42:52

11   Uniform Enforcement of Foreign Judgments Act here in Arizona.

12   Arguably it should be Wyoming.  But in either case, the state

13   laws of Arizona or Wyoming would not have permitted this sort

14   of action.

15         What would have happened is, they would have -- they        13:43:09

16   would have requested a writ of garnishment from the judge, the

17   judge would have signed off on it, sent it to the bank, the

18   bank would have reviewed their account and said, we don't hold

19   any accounts in the judgment debtor's name, sent back a reply,

20   and then the CWT parties would have had ten days to request a      13:43:27

21   hearing to make these sorts of arguments.

22         In utilizing New York, they're essentially taking

23   advantage of a unique forum shopping option that foregoes a

24   lot of this.  And as multiple of the cases have pointed out,

25   *JCS* (sic) and *North Mariana* included, utilizing the New York   13:43:50

1    law in such a manner presents a real risk of due process

2    violation.  And that's what we've seen.

3           And that's why I believe the statute states that it's

4    based on what was known at the time of service.  And that's why

5    *JCS* cites that rule accordingly.                                    13:44:12

6           THE COURT:  So due process, you know, I raised it in

7    my order, that I have some due process concerns with it.  But

8    on the other hand, one can view this statutory scheme as the

9    New York legislature made a policy choice that we want to give

10   all the tools possible to judgment creditors to make sure        13:44:29

11   they're made whole.  And so we created C.P.L.R. 5222.

12          And, you know, there are -- all the restraining notice

13   does is freeze the status quo, and then it gives other

14   procedural rights to the person whose account has been frozen,

15   for example, to go into court in New York very quickly and        13:44:51

16   challenge it.

17          The funds don't actually get turned over based on the

18   restraining notice, they only get held for a short period of

19   time.

20          And the statute also gives remedies potentially to        13:44:59

21   folks whose accounts are improperly frozen to get damages

22   against attorneys who issue these restraining notices without a

23   proper factual basis.

24          Why don't all of those safeguards address the due

25   process concerns that might otherwise be lurking in this          13:45:13

1   circumstance?

2          MR. TURRENTINE:  If that's the intention of the

3   New York legislature aside, I think we're seeing the problem

4   right here in front of us.

5          The restraining notice was issued in 2017.  We're now      13:45:25

6   here a year and a half later.  The accounts are deposited with

7   the court, and Wyo Tech has been without its operating -- or at

8   least 550 that was in, roughly, of its operating capital for

9   that period of time.  They've had to expend tremendous costs to

10  even make the arguments that this was done unreasonably.        13:45:44

11  And --

12         THE COURT:  So let me ask a question on that.  I

13  understand all of that.  But part of the reason that we're here

14  a year and a half later in a federal court in Arizona is

15  because when the restraining notice was issued, and Wyo Tech's   13:45:59

16  counsel was complaining to Wells Fargo and complaining to the

17  judgment creditors, the usual procedure is, you would

18  immediately charge into New York court under the jurisdiction

19  of the court that issued the restraining notice in the first

20  place and have a very quick fight and a turnover proceeding      13:46:15

21  over whether or not the funds were, in fact, properly

22  restrained.

23         Under New York law you have a quick entitlement to

24  that hearing, and under New York law if Wyo Tech had shown that

25  the funds were improperly restrained, they could have gotten    13:46:29

15

1    damages against the judgment creditors.

2         They didn't do any of that.  Instead, when Wells Fargo

3    said, we want to interplead these funds in Arizona to get out

4    of this and let the court sort it out, Wyo Tech consented to

5    that and agreed to it.  And that's, in part, why we're here.                13:46:43

6         MR. TURRENTINE:  Understood.

7         THE COURT:  And so I'm struggling to understand, given

8    that prior concession by Wyo Tech that an interpleader action

9    is proper, how they can now complain about the fact that

10   they're stuck litigating an interpleader action.                            13:46:56

11        MR. TURRENTINE:  And you make great points.

12        One of the key elements that I point out there is that

13   Wyo Tech never at any point considered that it would be subject

14   to New York law in the first place.  That was not part of

15   their -- their business plan.  They never availed themselves of             13:47:13

16   the laws of New York.

17        So essentially you could see the due process violation

18   where, if the standard is if a bank has a branch or maybe a

19   call center, or we connect all the banks through the Federal

20   Reserve system, or something very distantly connected to a                  13:47:31

21   certain state, businesses are not intended -- intentionally

22   prepared to deal with -- there's a reason why when they set up

23   their operating agreement and things like that, they select

24   what state they're going to operate out of, where they're going

25   to do business, and what the jurisdiction -- what the judicial             13:47:50

1   jurisdiction is going to be at the outset.

2            Being pulled into a New York court because they've set

3   up some safeguard procedures is a great intention on behalf of

4   the New York legislature, but in most manners it's very

5   impractical and unduly burdensome in a lot of cases.                 13:48:10

6            Whereas, okay, the issue is brought before a local

7   court where the members of Wyo Tech live, okay, they show up

8   here and hope that we can sort this out quickly.

9            But this isn't an issue that's been sorted out

10  quickly.  And I truly -- it would have been ideal to have gone     13:48:31

11  back and tried to fight with New York, but quite frankly I

12  think that's still an unreasonable expectation given the very,

13  very loose connection to New York State law and the fact that

14  they've never intentionally, impliedly, or made any sort of

15  connection with that forum state.                                    13:48:53

16            THE COURT:  Okay.  I want to turn to some of the

17  questions that I posed in the order.

18            One of them was, did the -- I guess one of the issues

19  here is whether or not a judicial finding of alter ego status

20  is required under New York law before a restraining notice has     13:49:15

21  been issued.

22            And I will say that even though there are some of

23  these federal cases, *JSC* and some other Federal District Court

24  cases that have cited *JSC*, do contain language suggesting that

25  a judicial finding of alter ego status is required before          13:49:29

1   notice can issue.

2        When you actually look at the underlying New York

3   state law that they're interpreting, I am not seeing much

4   support for that proposition.  To the contrary, I'm seeing an

5   array of different New York cases where judgment creditors were          13:49:43

6   allowed to issue restraining notices based on the unproved

7   suspicion that the account was held by an alter ego, and the

8   New York court said that that was fine.

9        MR. TURRENTINE:  In looking at your -- at the long

10  minute entry where you outlined a lot of these issues, I've          13:50:01

11  taken a look at several of those cases, and specifically the

12  cases that were outlined by the Law Review article.  And I

13  think there's a lot of very distinguishing factors.

14        If you'll allow me a moment here.

15        THE COURT:  Sure.          13:50:18

16        MR. TURRENTINE:  So the three main cases, if I

17  remember right, were *Ivor*, *Thompson*, and *Plaza Hotel*.

18        In *Ivor*, alter ego was never actually argued.  In *Ivor*

19  a restraining notice was issued under the fraudulent

20  conveyance, which you can make the argument it's connected to          13:50:43

21  alter ego theory.  But it was uncontested at that point.

22        We are contesting it.  We've been contesting it.  We

23  tried to contest it before we ended up in court.  I think the

24  situations are manifestly different.

25        And you kind of see that trend continue in some of the          13:51:01

1   other case law.  *Thompson*, for example.  *Thompson* was another

2   case that was heavily cited by the Law Review article.

3          It wasn't necessarily -- it wasn't an alter ego issue

4   in the form of an existing company that was operating on its

5   own, it was whether or not this alter ego even existed, because        13:51:26

6   it was a defunct business that had gone out.  And if I recall

7   the facts correctly, the judgment debtor was using the business

8   checking account and writing checks and paying expenses out of

9   that.

10          That's not the case here.  That's not even what's been        13:51:45

11   alleged here.  What's been alleged here is that Wyo Tech is the

12   alter ego, even though Wyo Tech has very clear operating --

13   operations, and the only evidence to suggest that Wyo Tech is

14   in some way owned by Danzik, or has some interest in there, is

15   because Wyo Tech paid money to Danzik for services rendered, is        13:52:08

16   what it was, and paid some of his legal bills.

17          But the legal bills that Wyo Tech has incurred have

18   largely been as a result of things like this.  It's been

19   largely on behalf of itself as well.

20          I don't think that the *Thompson* case makes that        13:52:25

21   argument as well as the author of the Law Review article

22   states.

23          And then similarly with the *Plaza Hotel* case, in the

24   *Plaza Hotel* case the party that was being restrained didn't

25   deny that it was the alter ego.  It essentially said, well,        13:52:41

1   you're making the wrong arguments, so deal with it.  I'm being

2   a little flippant, but that's how I read it.  It had nothing to

3   do with them vehemently denying that they were the alter ego,

4   as we have done continuously throughout this litigation.  They

5   said, well, you can't get me, is what they were trying to get          13:53:01

6   across.

7           So I think there's a lot of problems with some of the

8   case law.

9           But I think the more direct case law, the *JSC* case,

10  states it about as clearly as can be that these cases do not          13:53:13

11  stand for the principle that a person cannot be restrained

12  under a theory of alter ego.

13          And I think that's the most direct case law that cites

14  this, that has similar facts.

15          THE COURT:  I mean, the problem I have is, that's,             13:53:30

16  like me, a federal court, stumbling through diversity and

17  trying to understand state law.  And so the $64,000 question

18  is, let's look at state law, let's look at New York State law

19  cases.

20          Is there a case out there that says point-blank, I'm          13:53:46

21  not going to bless this restraining notice because it's issued

22  on an alter ego theory and you're not allowed to do that in

23  New York unless you already have a judicial finding on that

24  issue?  And I have not found a single New York case that says

25  that.                                                                 13:54:02

1      And so given the absence of authority on that, it

2  causes me to question whether *JSC* was properly interpreting

3  New York State law.

4      MR. TURRENTINE:  As far as whether or not there is a

5  case that directly cites it, I believe you're correct.  I have          13:54:12

6  not found the case that explicitly makes the case that you

7  cannot do this.

8      But I believe that you can draw a reasonable inference

9  from both the statute and the case law that has been presented,

10  and even more so from common sense.  And I don't mean that to     13:54:32

11  impugn anybody.

12      But if we allow this sort of theory -- and this kind

13  of touches on the due process elements that you were

14  discussing.  If we permit this sort of action to continue in

15  the way that it has been, it's going to result in a lot of          13:54:49

16  people selectively choosing the New York forum to enjoin and

17  freeze operating costs, which could have detrimental effects on

18  some who aren't as able as Wyo Tech to weather the storm.  You

19  could imagine the political implications of seizing Super PAC

20  funds or --                                                              13:55:12

21      THE COURT:  I'm just -- I don't think the implications

22  are as grave as you're saying, because if somebody actually

23  follows New York law, once their account gets restrained, they

24  can immediately go into New York State Court, challenge the

25  validity of the restraining notice, prevail, get their money          13:55:24

CV-17-4140-PHX-DWL – April 8, 2019

1   unfrozen, and get a bunch of damages against the attorney that

2   froze their money in the first place, if they just followed

3   New York law.

4          MR. TURRENTINE:  When I went through law school I

5   always thought, when legislation is getting passed, what's the          13:55:38

6   scariest outcome?  And I can imagine a company much smaller

7   than Wyo Tech, not in New York, a new startup, for example,

8   that doesn't have the operating costs or the legal wherewithal

9   to hire expensive attorneys to fly across the country to

10  essentially argue in a state that they never thought they'd          13:55:58

11  have any business in.

12          You're right, the New York State legislature has set

13  out protections, and probably with the best of intention.  But

14  if you have -- if somebody in New York knows of a competitor

15  rising up out here in Arizona, or something like that, it would          13:56:16

16  be really easy to utilize these procedures to suck a lot of

17  their operating capital out, on the risk of going to another

18  state where they're not familiar with the laws and hire

19  expensive attorneys.

20          I think that's an unreasonable -- an unreasonable          13:56:33

21  expectation to have on somebody who never intended to

22  participate in the New York forum in the first place.  Which,

23  again, isn't to say that the legislature didn't have the best

24  of intentions, but if it is established that somebody can go to

25  New York because it has this favorable law and can reach across          13:56:54

CV-17-4140-PHX-DWL - April 8, 2019

1    the country and affect new startups, or individuals, or people

2    who don't have the funds or the ready access to high-priced

3    lawyers, this could be a really detrimental violation of due

4    process.

5         Which is what the point of due process protections are       13:57:11

6    supposed to be.  It's there to ensure that, you know, at least

7    in the federal constitution, that the long arm of the federal

8    government can't hurt the little guy.  That's the point.

9         And with regards to that -- the statute 5222,

10   essentially what it's doing, it's allowing the advocate, the     13:57:31

11   nonneutral attorney for the judgment creditor, to act as a

12   neutral magistrate and issue the restraining notice themselves

13   to their own benefit.

14        It would be -- I analogize it to being police officers

15   being able to sign their own search warrants.  While it may not   13:57:53

16   yet, we're seeing an example of how difficult that can make the

17   process.  And if allowed to continue setting precedent, that's

18   going to create potentially tremendous problems for those who

19   are least able to make those -- make it to New York to fight

20   it.                                                               13:58:16

21        THE COURT:  All right.  I think I understand your

22   position.

23        Are there any other things you'd like to address?

24        MR. TURRENTINE:  No, Your Honor.  I think that about

25   sums it up.  And I appreciate the time and consideration.         13:58:25

1          THE COURT:  Okay.  Thank you.

2          MR. TURRENTINE:  Thank you.

3          THE COURT:  All right.  Mr. Wurtzel.

4          MR. WURTZEL:  Yes.  This is Josh Wurtzel from Schlam

5    Stone for the CWT parties.                                    13:58:43

6          Thank you again, Your Honor, for accommodating me by

7    phone.

8          If it's okay with the Court, I'll pick up where my

9    adversary left off regarding due process, and the first

10   question that Your Honor posed in the order requesting        13:58:55

11   supplemental briefing about whether a prior adjudication of

12   alter ego liability is required before a restraining notice can

13   be issued.

14         Your Honor is correct that the underlying New York

15   cases -- and I think we've cited four or five of them at       13:59:10

16   least -- specifically almost factually on point 100 percent

17   showing that a prior adjudication of alter ego liability is not

18   required before you could issue a restraining notice.

19         That makes sense, Your Honor, because if a judgment

20   creditor had to litigate a -- someone's alter ego liability    13:59:30

21   before issuing a restraining notice, the utility of the

22   restraining notice as a judgment creditor's tool under New York

23   law would be rendered ineffective.  Because the whole point of

24   being able to issue a restraining notice is to, as Your Honor

25   pointed out, freeze the money and then fight over it.  If you  13:59:53

CV-17-4140-PHX-DWL – April 8, 2019

1   have to fight over it before you can even freeze it, you know,

2   the freezing of it ends up being useless because in all

3   likelihood the money won't be there anymore.

4           The point that I was getting from my adversary is that

5   this -- that the statutory scheme under the New York C.P.L.R.,          14:00:08

6   and this is Article 52, which under New York law deals with

7   judgment creditor's enforcement rights and judgment debtor's

8   rights, it sounds like what Wyo Tech is asking the Court to do

9   is strike down all or a significant portion of Article 52, or

10   at least this one section that required -- that allows for          14:00:30

11   restraining notices to be issue.

12           And I have to say, this would be the first court ever

13   that has done that.  Not a single case that we've located that

14   Wyo Tech has cited --

15           THE COURT:  Let me.          14:00:45

16           MR. WURTZEL:  -- involves --

17           THE COURT:  Let me hit the pause button on that.  I

18   mean, I think that their argument, fairly construed, is simply

19   that you're not allowed to issue it in this circumstance when

20   you're pursuing an alter ego theory yet there hasn't been a          14:00:55

21   judicial determination of that particular theory.

22           And at least three federal courts -- *JSC*, the *Capitol*

23   *Records* court and *AXGINC* -- have all endorsed variance of that

24   position.

25           So you're asking me to come out the other way and          14:01:15

UNITED STATES DISTRICT COURT

CV-17-4140-PHX-DWL – April 8, 2019

1   respectfully disagree with three federal district judges who

2   are in New York, and presumably are more familiar with New York

3   State law than folks all the way out here in Arizona.

4           So I think that you're overstating their position a

5   little.  Their argument is more narrow as to the alter ego          14:01:32

6   thing.  And there is some federal diversity case law on their

7   side.

8           MR. WURTZEL:  That's true, Your Honor.  There is

9   some -- there is some language in these cases.  But as

10  Your Honor pointed out before, when you look at the underlying     14:01:45

11  cases -- I'll point the Court -- specifically this is in our

12  supplemental briefing docket number 114, page 3 of 14, we cite

13  *Thompson against Pollack* from 2009.  This is a New York

14  appellate division case, which is the equivalent of the

15  Ninth Circuit in the New York State's court system.                14:02:05

16          There there was a judgment creditor that used a

17  restraining notice to freeze a nondebtor's bank account on the

18  ground of -- the creditor believed that the judgment debtor had

19  an interest in the funds.

20          And in that case there was no prior adjudication of         14:02:21

21  alter ego liability.  And the nondebtor, just like Wyo Tech

22  here, argued that it was the owner of the restrained account

23  and the judgment debtor had no interest in the money.  But

24  still, despite the absence of a prior adjudication of alter ego

25  liability, the court refused to vacate the restraining notice      14:02:40

CV-17-4140-PHX-DWL – April 8, 2019

1   and held that the case should be remitted to the trial court

2   for a hearing to determine who had an interest in the funds.

3            If the law was as stated in the *JSC* case and these

4   other federal cases that you have to have a prior adjudication

5   of alter ego liability, then it wouldn't matter what the          14:02:57

6   hearing after the restraining notice was issued showed, all

7   that would matter is that you didn't have that finding before.

8            The same -- I'll make the same point about the case on

9   page 4 of our supplemental brief, *1420 Associates, Inc. against*

10  *Landfill & Recycling.*  This is also from the New York appellate   14:03:15

11  division from 1998.  Same thing, the judgment creditor used a

12  restraining notice to freeze a nondebtor's bank account on the

13  ground that the judgment debtor was using the account to pay

14  his personal expenses.  There was no prior adjudication of

15  alter ego liability there.                                          14:03:33

16           And then like here, the judgment -- the nondebtor

17  asserted that it was the owner of the bank account, and that

18  the -- it was separate and distinct from the judgment debtor,

19  exactly the argument that Wyo Tech makes here.  But the Court

20  again refused to vacate the restraining notice and instead         14:03:48

21  remitted to the trial court for a hearing to determine whether

22  the judgment debtor had an interest.

23           So respectfully, Your Honor, again, I think Your Honor

24  made this point.  With all due respect to those three federal

25  cases, whether they can be distinguished or whether they're        14:04:01

CV-17-4140-PHX-DWL – April 8, 2019

1    just wrong, the underlying New York case law is pretty clear

2    that there is no requirement of a prior adjudication of alter

3    ego liability.

4         So once -- if the Court accepts that the underlying

5    New York case law doesn't require this, then what Wyo Tech is                14:04:18

6    arguing is that without that prior adjudication there's a

7    violation of due process.  So either we're right on the law,

8    we're wrong on what -- either we're right on what New York law

9    requires or we're wrong.  But if we're right, then Wyo Tech's

10   only argument is that, even if that's New York law, it violates           14:04:37

11   our due process rights.  And there's not a single case that

12   holds that, despite Article 52 and C.P.L.R. 5222 saying what it

13   says, that that violates a nondebtor's due process rights.

14        You know, the other thing is that, as Your Honor

15   mentioned, you know, we're here in Arizona Federal Court a year           14:04:58

16   and a half later because Wyo Tech chose not to go into New York

17   court, and they chose not to make a motion to vacate the

18   restraining notice before the New York court.

19        Wyo Tech obviously could have done that.  For

20   strategic or other reasons they chose not to.  But that's                 14:05:17

21   something that they could have done.  And the fact that they

22   didn't, and then they consented to the interpleader, to now

23   hear them complain actually this whole scheme violated our due

24   process rights is a bit disingenuous.

25        And the last point regarding due process, Your Honor,             14:05:32

CV-17-4140-PHX-DWL – April 8, 2019

1   is -- and Wyo Tech respectfully, you know, disagreed with this

2   argument, but under New York law, a restraining notice is an

3   order directed to the garnishee, not to Wyo Tech, but in this

4   case to Wells Fargo.  And the restraining notice is the

5   equivalent of a court order saying, Wells Fargo, whatever money          14:05:52

6   you have in your possession, you have to freeze that money.

7       And New York courts have interpreted this as meaning

8   all you have to have for a restraining notice is jurisdiction

9   over the garnishee.  Meaning that if Wells Fargo is under the

10  New York court's jurisdiction, the New York court can order          14:06:10

11  Wells Fargo to freeze the money.  We're not talking about a

12  turnover motion.  We're not talking about an attachment.  And I

13  believe attachment is actually separate.

14      But in this particular instance, the only

15  jurisdictional hook is the jurisdiction over the garnishee          14:06:23

16  holding the funds.  And there's no dispute that Wells Fargo was

17  subject to jurisdiction in New York.

18      The only response that Wyo Tech has is, well, we

19  weren't thinking about having anything to do with New York --

20      THE COURT:  Let me -- let me just ask you to slow down          14:06:38

21  a little, because -- for the court reporter's perspective.

22      MR. WURTZEL:  Sure.  I apologize, Your Honor.

23      Wells Fargo -- Wyo Tech's argument here is that we

24  never anticipated coming to New York or having anything to do

25  with New York, because when we set up our Wells Fargo account          14:07:00

1   it was in Arizona and we were doing all our business in Arizona

2   or in Wyoming, we had nothing to do with New York.

3           But that's -- that's a very ignorant way of thinking

4   about personal jurisdiction.  And I understand that maybe

5   Wyo Tech wasn't aware of this case law, and had they been aware      14:07:21

6   maybe they would have chosen a bank that didn't have a branch

7   in New York.

8           But the CWT parties, my clients, shouldn't be

9   prejudiced because Wyo Tech chose to avail itself of the use of

10  a bank that is subject to jurisdiction in New York.  And now it      14:07:38

11  doesn't want to be bound by the consequences of literally

12  putting its money in the hands of somebody who's subject to a

13  New York court.

14          So on the one hand, give Wells Fargo your money -- and

15  I think it's fair to say that they had to have known that           14:07:53

16  Wells Fargo had branches in New York when they made the

17  deposit, even if they didn't think they would ultimately have

18  to go to New York, and then choose not to come to New York when

19  there was a restraining notice issued in New York at the

20  New York branch to enforce a New York judgment.                     14:08:09

21          This is not an instance of forum shopping.  This is

22  where the judgment was, and this is why it's being enforced

23  here.

24          Respectfully, Your Honor, under New York law it's

25  enough to have jurisdiction over the garnishee.  And the            14:08:23

1    complaint by Wyo Tech that we shouldn't have to come to

2    New York, as Your Honor pointed out, there are a lot of

3    procedural safeguards, and it was Wyo Tech's choice to deposit

4    its money with Wells Fargo rather than with a local blank that

5    only has branchs in Arizona or Wyoming.                          14:08:40

6              THE COURT:  Okay.  Thank you.

7              A question I have -- and this doesn't really go to the

8    three issues I set out in my supplemental brief.  So let's

9    say -- let's say I rule in your favor on these issues and you

10   get discovery and then we proceed throughout 2019 on discovery,  14:08:55

11   and now it's time to file dispositive motions.  What does the

12   dispositive motion actually look like?  When you come in and

13   say you have the superior claim to the interpleaded funds, what

14   law are you applying, and what theory are you going to

15   articulate?                                                       14:09:16

16             MR. WURTZEL:  So, Your Honor, if I may, the law will

17   be the law of interpleader actions under federal law.  So the

18   court's role in this case, in this interpleader action, is to

19   determine the, quote, ownership of the disputed funds.  And we

20   cite a lot of cases showing that on page 7 of 14 of docket --    14:09:36

21             THE COURT:  So like -- but there's no -- as far as I'm

22   aware, no federal common law of how you construe an alter ego

23   claim.  I guess I was presuming, but I don't know with

24   certainty because we haven't got there yet, that you would be

25   arguing that Wyo Tech qualifies as the alter ego of Danzik       14:09:55

1    under New York law, which is applicable here as a matter of

2    diversity.  But maybe that's incorrect.  So that's what I'm

3    just trying to still see in my mind how this is all going to

4    play out a couple months down the line.

5             MR. WURTZEL:  Sure.  I think -- I think there are two    14:10:14

6    issues that we're maybe mixing and matching.

7             The first issue is, what is the Court deciding?  And

8    what we say is that the Court is not deciding whether the

9    restraining notice was valid in the first place, the Court is

10   deciding ownership of the funds.  And I think that's well       14:10:29

11   established in the case law, the question is ownership.

12            The next question is, well, how do you determine

13   ownership?  Well, there's not a federal common law on ownership

14   of money.  So I think Your Honor's correct, the answer would be

15   that we would apply New York law on who has the superior claim   14:10:43

16   on who is the, quote, owner of these funds.

17            We might make an alter ego argument, which would be

18   that Wyo Tech is the alter ego of Dennis Danzik, and thus the

19   money there is functionally his.

20            We might also argue that, you know, that it's           14:11:03

21   not -- not that it's an alter ego, but that the money that's

22   sitting there, even if Wyo Tech is a separate entity, that that

23   particular money happens to belong to Dennis Danzik, which is

24   slightly different than an alter ego argument.

25            I don't know specifically whether we'll argue one or    14:11:20

UNITED STATES DISTRICT COURT

—CV-17-4140-PHX-DWL – April 8, 2019—

1    both of those.  But to Your Honor's question, the Court would

2    have to decide who is the owner of the funds.  And then I

3    believe -- and we would have to -- this would have to be the

4    subject of briefing at the summary judgment stage.  But we

5    would argue that New York law about ownership is what would          14:11:34

6    govern here.  And we would make various arguments not just

7    limited to the alter ego one.

8             THE COURT:  Okay.  Thank you.

9             Another issue I wanted you to address.  One of the

10   motions that's before the Court is Wyo Tech's motion to dismiss     14:11:49

11   slash motion for judgment on the pleadings.  It's at docket

12   number 95.  And one of the arguments they make there is, all of

13   this stuff about whether you guys can step into the shoes and

14   grab Wyo Tech's funds because it's the same thing as Danzik,

15   was already considered by the bankruptcy judge in Wyoming who       14:12:09

16   ruled on the merits against you.  And, therefore, that should

17   have some sort of preclusive effect on this Court.

18            So please address that argument.

19            MR. WURTZEL:  Sure, Your Honor.

20            So first of all, that's not true.  What happened in        14:12:23

21   the Wyoming Bankruptcy Court -- I guess the first point

22   actually is that that case has been dismissed.  And we've cited

23   case law showing that once the bankruptcy case is dismissed,

24   everyone's put back to their prebankruptcy position.

25            So, you know, the fact that the case was dismissed          14:12:43

1    means that that holding is actually -- that holding in and of

2    itself inherently has no preclusive effect.

3            But on the merits, what happened there was, we had

4    brought a motion in the Wyoming Bankruptcy Court asking to

5    assert fraudulent transfer claims against Wyo Tech.  And the          14:13:02

6    reason we wanted to do that is because we believed that

7    Wyo Tech -- that Dennis Danzik had transferred assets,

8    including intellectual property and various technology from

9    RDX, which is the other judgment debtor that we have, that

10   Danzik was the CEO of.  That he had transferred that                  14:13:22

11   intellectual property from RDX to Wyo Tech.  And there was

12   certain things in Mr. Danzik's bankruptcy filing that indicated

13   that he was possession of intellectual property that had

14   belonged to RDX, and was now in the use -- was now being used

15   by Wyo Tech.                                                          14:13:41

16           So we went to -- on the advice of our bankruptcy

17   counsel, who told us that any fraudulent transfer claims that

18   are brought during a bankruptcy belong to the bankruptcy

19   estate, we went to the Wyoming Bankruptcy Court and we asked

20   the Wyoming Bankruptcy Court to allow us to assert these             14:13:56

21   claims.

22           And again, the claims we were looking to assert had

23   nothing to do with the money that has been interplead here.  We

24   didn't need the Bankruptcy Court's permission to litigate over

25   the money here, because the Bankruptcy Court had already given       14:14:14

1   that permission in a separate order lifting the automatic stay

2   to allow this case to go forward.

3        So we already had Bankruptcy Court approval to

4   litigate over the interplead funds.  What we needed Bankruptcy

5   Court approval to do was to go -- was to assert fraudulent            14:14:30

6   transfer claims for other assets that were -- that alleged

7   or believed were fraudulently transferred from Danzik to

8   Wyo Tech.

9        It wouldn't have made any sense for us to go ask for

10  permission to assert fraudulent transfer claims if the basis       14:14:48

11  for those claims was going to be the -- you know, the

12  interplead money which we were already litigating.  We didn't

13  have to assert another claim.  If we win the interpleader, we

14  win the money.  We don't need to have another claim.  We wanted

15  to assert a separate claim for separate assets.                     14:15:06

16       In that motion to the Wyoming Bankruptcy Court, the

17  Wyoming Bankruptcy Court considered a number of factors,

18  including the fact that we hadn't asked -- formally asked

19  Mr. Danzik to bring those claims, and other bankruptcy factors

20  under the Bankruptcy Code for when to confer derivative            14:15:23

21  standing on a creditor to assert a claim.  And one of the

22  things the Court said was that our allegations about fraudulent

23  transfer were conclusory and speculative.

24       And to be honest, that wasn't a bad assessment, given

25  that we didn't get into the level of detail about where the --     14:15:40

CV-17-4140-PHX-DWL – April 8, 2019

1    exactly what assets were fraudulently transferred.

2           But what the Court did not do was rule on whether we

3    could assert -- whether the CWT parties as creditors could

4    assert that the interplead funds were -- you know, are funds

5    that belonged to Danzik.  That was never an issue before the          14:15:58

6    Court -- before the Wyoming Bankruptcy Court on that motion.

7    And the Wyoming Bankruptcy Court did not purport to adjudicate

8    that issue.

9           THE COURT:  Okay.  Thank you.

10          Is there anything else you'd like to address?                   14:16:11

11          MR. WURTZEL:  I guess the only other thing which my

12   adversary mentioned at the beginning was this motion to enjoin

13   the restraining notices.

14          As Your Honor observed, Wyo Tech has already withdrawn

15   all of that motion other than the reconsideration part of the         14:16:31

16   motion.  And I didn't really hear it from the other side, but

17   I'll say it affirmatively, nothing about these later

18   restraining notices changes any of the Court's personal

19   jurisdiction analysis, nor do these later acts, which wouldn't

20   give rise to personal jurisdiction anyway under the Court's           14:16:51

21   initial analysis.  But even if they did, these are additional

22   separate acts that give rise to a completely separate claim.

23   They don't increase the contact that the CWT parties or their

24   counsel had with Arizona when they served the 2017 restraining

25   notice.                                                                14:17:11

1      And with that, unless Your Honor has additional

2   questions, we have nothing further.

3      THE COURT:  Okay.  Thank you.

4      Mr. Turrentine, if you'd like a few more minutes, I'll

5   give you a chance for rebuttal.                           14:17:21

6      MR. TURRENTINE:  Thank you much.

7      So when opposing counsel brought up due process at the

8   very beginning, he noted that one of the benefits of the

9   New York law is that it essentially freezes the funds.  And

10  that's correct.  And what I'm hearing as the argument is, well, 14:17:51

11  the reason why that's beneficial is because those funds are

12  frozen and, therefore, can't be fraudulently conveyed later on

13  down the road.

14      Which, one, is assuming that a Class 6 felony, at

15  least here in Arizona, is going to take place.            14:18:13

16      And two, it's also not a problem in Wyoming or here in

17  Arizona where the judgment is domesticated.  In fact, that is,

18  as it's been pointed out, a procedural safeguard that's

19  recognized in the vast majority of forums, but certainly here

20  in Arizona where the judgment was domesticated.          14:18:32

21      If we're talking about the procedural safeguards that

22  are in place, opposing counsel seems to acknowledge that what

23  New York State law does is essentially give the benefit of the

24  doubt to the judgment creditor, which is not something that I

25  think is a reasonable assumption to make, given the       14:18:54

1   universality of the Uniform Enforcement of Foreign Judgments

2   Act.

3           And additionally, and I was trying to find it, but in

4   the response to the letter by Eilender in November of 2017, I

5   think it was the response to the November 2nd letter, the          14:19:16

6   opposing counsel refers to that and says, oh, yeah, well, you

7   know, it would be a potentially fraudulent transfer, and here's

8   the -- we'll pursue fraudulent transfer claims.  Essentially

9   acknowledging the safeguards that would have been available

10  here, but they chose not to avail themselves of.                    14:19:33

11          Additionally, opposing counsel cites *Thompson* as

12  line-by-line example.  And I would take contention to that.

13  The party in *Thompson*'s business entity alter ego is a

14  nonexistent entity, not an entity that, like Wyo Tech, or even

15  IEC, or any of these other parties, actually exists and            14:19:58

16  actually has business operations ongoing.

17          So, again, I would say that there's a difference

18  there, even if the Court says that -- you know, the State Court

19  of New York says, okay, that's fine to seize their assets.  The

20  assertion was not, okay, this is a legitimate business that's      14:20:18

21  operating under a false flag, they're saying it didn't exist.

22  And something that doesn't exist can't have harm, which is a

23  crucial distinction between that and this.

24          It's also interesting -- I brought up a little while

25  ago that they domesticated the judgment here in Arizona, but       14:20:41

1    again, chose the least convenient forum.  And, yeah, that's an

2    argument that I think should hold more weight than is given

3    credit to, subjecting somebody -- and that's kind of the

4    argument behind the *North Mariana* case that, okay, well, the

5    parties whose funds have been restrained are subject to

6    New York law.                                                    14:21:07

7         But the two key aspects of that case are that, one,

8    the parties whose funds were restrained were never -- never

9    demonstrated any harm, never claimed any harm from that

10   seizure.  If my memory serves it was a trust account for       14:21:24

11   children that they wouldn't have access to for years.  So

12   slightly different scenario.

13        And, again, that was in Merrill Lynch, New York.  So

14   even if we're going to make the jurisdictional argument that

15   somebody was subjected to the New York forum, Merrill Lynch     14:21:38

16   makes a lot of sense, they're headquartered in New York, unlike

17   the banks that have been gone after in these cases.

18        I wanted to bring up the case *Zolt*, which was brought

19   up in the stipulated -- the stipulated arguments for the

20   discovery dispute.                                              14:22:01

21        THE COURT:  I view *Zolt* as a Rorschach test that both

22   parties could peer into and find something that supports their

23   position.

24        MR. TURRENTINE:  That's probably true.  But as I'm

25   here to advocate for my side, let me at least argue what I see  14:22:13

1    has taken place.

2            So, again, a lot of the assertions that have been

3    made -- and even there's some case law that talks about, oh,

4    paying the personal expenses for Dennis Danzik, just as a

5    factual matter what we've asserted is entirely different than I        14:22:31

6    think what the simple deposits and -- yeah, simply depositing

7    money into the funds, and then having those distributed after

8    the fact, there's no evidence that -- that's been presented

9    really at all, but there's not even an assertion that Dennis

10   Danzik took some windfall moneys that he had hiding, opened it         14:22:52

11   up in the name of Wyo Tech.

12           Essentially what the claim is is that, oh, well,

13   because Wyo Tech is paying some of Danzik's bills, also known

14   as employing him in a contractual manner quite often, that

15   demonstrates evidence.  And I think that's -- that's a tenuous         14:23:11

16   assertion at best.

17           And what's more, even the dollar amounts of what's

18   been asserted and paid and all this other stuff still wouldn't

19   rise to the level of being able to seize the entire operating

20   capital of Wyo Tech.                                                   14:23:28

21           For example -- and this is not, of course, to impugn

22   you.  But if you were the judgment debtor to me the creditor, I

23   would not be able to go -- for say $7 million, I would not be

24   able to go after the Department of Justice's Treasury because

25   they're paying your salary and assume that the entirety of the         14:23:45

1   account, at least up to the amount of my judgment, therefore,

2   belongs to you.

3          As just a matter of -- again, as a matter of justice

4   here, the assumption that the entirety of Wyo Tech's operating

5   capital in that Wells Fargo account could be seized on the idea          14:24:02

6   that they have spent some moneys, not moneys that are still

7   alleged to be in the account, but have spent money on

8   attorney's fees and salary for Mr. Danzik, I think is a gross

9   overstep and, again, huge potential for due process abuse.

10         And if you were my judgment debtor and I went after          14:24:29

11  the Department of Justice's bank account, I think we all know

12  that there's no way the Federal Government would stand in and

13  accept that.  And I don't think that that's a reasonable -- and

14  I think that assumption is fairly reasonable.

15         THE COURT:  All right.  In your hypothetical you don't          14:24:44

16  have the Department of Justice then, although they grumble at

17  first, consenting to an interpleading action where all the

18  money would get put into Federal Court for further litigation.

19         MR. TURRENTINE:  Fair enough.

20         Finally, the CWT parties are arguing that the matter          14:25:00

21  in the Bankruptcy Court is significantly different.  Of course,

22  they're not arguing for the -- these interpleader funds.  But

23  that's not what the requirement for judicial notice is.  It's

24  similar facts, similar parties.  Not the exact same thing,

25  because there would be, of course, no reason to go after the          14:25:26

1    exact same thing in multiple jurisdictions.

2           However, even in their own pleadings you see that

3    funds, plural, are included in what they were seeking in the

4    bankruptcy action, along with the intellectual property and

5    stuff like that.  Their assertions of alter ego and fraudulent      14:25:42

6    conveyance essentially in the Bankruptcy Court were

7    overinclusive.  But that doesn't mean that they're

8    substantially different in any way than the funds that are

9    available here.  They are funds that have been alleged to have

10   been fraudulently transferred or in the possession of an alter      14:26:02

11   ego for Dennis Danzik.

12          So the overall issue of, oh, well, these are slightly

13   different, I don't think in any way pushes back on the idea of

14   taking judicial notice of another Federal Court ruling on the

15   issue.  Even if the case was ultimately dismissed, part of the      14:26:24

16   overall jurisprudence was in this issue, and it was ruled upon

17   on the merits.

18          THE COURT:  All right.  Thank you.

19          A final question I have.  If I end up ruling against

20   you and agreeing to enforce the subpoenas, will two weeks be        14:26:40

21   enough time to comply?

22          MR. TURRENTINE:  As I stated earlier, Mr. Wilenchik,

23   the partner, is returning on Thursday.  If two-and-a-half weeks

24   or pushing back to the end of the third week, I think that

25   would be better, because he's been gone for the better part of      14:26:57

1   a month now and there's 1,000 things on the partner's desk that

2   are going to have to be dealt with.

3          THE COURT:  Understood.

4          MR. TURRENTINE:  That's if you see it in your wisdom

5   to do that, then three weeks would be preferable.                14:27:11

6          THE COURT:  I understand.

7          MR. TURRENTINE:  Thank you.

8          THE COURT:  All right.  Well, I'll take this under

9   submission --

10         Excuse me.  Mr. Wurtzel, were you trying to say           14:27:18

11  something?

12         MR. WURTZEL:  Yes, Your Honor.  Thank you.

13         And just -- if the Court does rule that we are

14  entitled to take discovery, which we think is the way the Court

15  should come out, there is a fact discovery cutoff of April      14:27:31

16  29th.  We had reached out to counsel for Wyo Tech to push this

17  back.

18         And honestly there hasn't really been any discovery in

19  the case other than the initial disclosures from the MIDP.  We

20  had served a number of subpoenas, not a single one of which was  14:27:46

21  complied with, and we're going to have to be chasing nonparties

22  in other jurisdictions, and we might even have a motion or two

23  before Your Honor.

24         But in any event, we expect to ask the Court, putting

25  aside -- I'm fine with the two law firms having two-and-a-half    14:28:00

UNITED STATES DISTRICT COURT

CV-17-4140-PHX-DWL – April 8, 2019

1   or three weeks or that amount of time.  But regardless, the

2   April 29th deadline, we are going to ask the Court to push that

3   back so that we can, you know, enforce these subpoenas, take

4   party document discovery, which we were actually promised by

5   Wyo Tech last week and we didn't get.                                    14:28:21

6          But in any event, my point is that there is basically

7   all the discovery in this case that remains to be done, and

8   we're going to need more time.

9          THE COURT:  Well, I appreciate hearing that.  I'm not

10  going to prejudge how I'm going to rule on any future request        14:28:32

11  to extend the discovery deadlines, other than, my general

12  approach is, when I set deadlines, I mean to adhere to them.

13  I'll only agree to move them if Rule 16's good cause standard

14  has been met.

15         It may be that you can show good cause here.  But I          14:28:50

16  certainly would encourage you, at a minimum, if there are

17  things you haven't even yet tried to notice, document requests

18  you haven't even sent out, depositions you haven't tried to

19  notice, and you want an extension so that you can start

20  belatedly doing that, I'm probably going to look more              14:29:07

21  pessimistically on that type of request.

22         If, conversely, there are things that you have long

23  ago issued that you haven't received compliance because the

24  receiving party has been under the impression that discovery

25  was unavailable here, I'd probably be more willing to look        14:29:22

UNITED STATES DISTRICT COURT

1    favorably upon that.

2           I'm not going to tell you right now that I'm just

3    going to rubber stamp a request to extend all the deadlines.

4    I'll look very carefully at that.

5           MR. WURTZEL:  I understand, Your Honor.              14:29:38

6           And just for the record, we actually did notice all

7    the depositions -- all the party depositions on February 3rd.

8    And we served probably half a dozen to -- probably closer to a

9    dozen nonparty subpoenas also at the beginning of February.

10          And, you know, we pushed off the depositions because   14:29:54

11   we -- I'm sorry, we also served document requests and

12   interrogatories on Wyo Tech on February 3rd.

13          Wyo Tech had asked for an extension and then another

14   extension, and it was supposed to be April 5th that they were

15   going to respond.  We didn't get those responses.            14:30:09

16          Because we didn't have any party documents we agreed

17   to push off the party depositions until we can get the document

18   productions.

19          And then the nonparties, we served those subpoenas two

20   months ago.  And having spoken to one of the witnesses, I was   14:30:21

21   told that a Wyo Tech principal had told him to disregard it and

22   throw it in the trash.

23          So given the pendency of the current motion, in

24   particular the supplemental briefing that the Court asked, we

25   haven't come to Your Honor to ask for an extension or to move   14:30:36

CV-17-4140-PHX-DWL – April 8, 2019

1    to compel just yet, but all the discovery -- or virtually all

2    the primary discovery, both party and nonparty, that we're

3    going to want in this case, we served and we served months ago.

4    We just haven't gotten compliance with them.

5           THE COURT:  I understand.                                 14:30:53

6           Well, just for -- as I said earlier, I intend to issue

7    a ruling on all of these pending motions very soon, if not

8    today, tomorrow, you know, sometime this week.

9           I just -- to avoid the suspense, I think it's very

10   likely I'm going to rule that the judgment creditors are       14:31:10

11   entitled to conduct discovery, and I'm going to rule to enforce

12   these subpoenas.

13          And so I'm hopeful that, assuming the order comes out

14   that way, that could give clarity to the parties and even the

15   nonparties on what the parameters going forward are going to    14:31:23

16   look like on the discovery front.  And hopefully the order will

17   give a lot of guidance that you all can work together to figure

18   things out without coming to the Court for discovery disputes.

19          But if that's not the case, please follow my usual

20   protocol about presenting discovery disputes in the form of a   14:31:40

21   joint two-page summary.

22          MR. WURTZEL:  Thank you, Your Honor.

23          THE COURT:  All right.  Is there anything else?

24          MR. TURRENTINE:  No, Your Honor.

25          THE COURT:  Okay.  Thank you very much.  I appreciate    14:31:51

1    the argument.  I know you both put a lot of time in preparing

2    for it, and we had a lot of issues to address today.  So the

3    argument was very helpful.

4            Thank you very much.

5        (Proceedings concluded at 2:32 p.m.)                    14:32:02

6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 10th day of April,

15   2019.

16

17

18

                          s/Candy L. Potter_____
19                        Candy L. Potter, RMR, CRR

20

21

22

23

24

25