# Exhibit H

Operating Agreement of
# WYO Tech Investments Group, LLC
A Wyoming Limited Liability Company

Effective as of September 1, 2016

### ARTICLE I.
### DEFINITIONS

THIS Operating Agreement is made and entered into effective as of September 1, 2016, by Danzik Applied Sciences, LLC (Elizabeth J. Danzik, Manager) (collectively, the "**Member**"), whose signatures appear on the signature page hereof.

WITNESS THAT:

Danzik Applied Sciences, LLC Managing Member for WYO Tech Investments Group, LLC (the "**Company**") filed the required documents with the Secretary of State of Wyoming on September 1, 2016, and having Wyoming State file number 2016-000725055 with Federal Employer Identification Number 81-3735985 for, for the benefit of all of the Parties hereto.

From the instant of formation until September 1, 2016, there has been no Operating Agreement in place or in force.

NOW, THEREFORE, the Members agree as follows:

A.    That the Company on September 2, 2016, has acquired from Danzik Applied Sciences, LLC ("DAS"), through agreement the exclusive worldwide licensing rights of The Danzik Asymmetrical Disk/Ring KE Inductance Engine ("Engine"), and will perpetually license the design, construction and marketing through a Single Corporate Entity ("SCE"), as yet to be named. The SCE shall have the right and responsibility to construct sub-license agreements with Special Purpose Entities ("SPE") to rent, lease and sell the Engine device developed by Danzik Applied Sciences, LLC. The sole purpose of this Company is to own all improvements, license, sub-license, and protect the intellectual property known as the Engine.

B.    The Company shall have no short or long term debt, other than to its Members or Managers, and only if voted for by a Unanimous vote of all of the Membership.

C.    The SPE(s) will be based on geographical locations, market areas, or by industry segment, to be determined as each SPE is setup to operate by the SCE. All SPE sub-licenses shall be approved by the Company Manager. SPE's may include sub-licenses, if approved by the Company Manager. Any Member of this Company may participate in the ownership of any SPE(s) at their sole option.

D.    The Company shall grant permanent exclusive licenses for the Engine, to SPE's, corporations, individuals, or joint ventures based on business plans submitted, license offers made, and shall be approved at the sole option and discretion of the Manager, which approval shall not be unreasonably withheld.

E.    The Manager shall be DAS, represented by DAS Manager, Elizabeth J Danzik or her assign, and her primary duty is the management of the Company.

F.    The company shall have an Advisory Board, made up of seven (7) to nine (9) Members, nominated and chosen by the Manager. Each Advisory Board Member shall serve a one year term. Advisory Board Members may serve multi-year terms at the will of the Manager. The Advisory Board will

QB 159654.00003 39748777.2
09-01-16

WYOTECH00001032

CONFIDENTIAL

assist in developing a) License Agreements, b) developing market area agreements, c) developing industry segments agreements, d) making recommendations for approving or denying License Agreements, Sub-Licensing Agreements, and other agreements that affect the value of the Companies Intellectual Property, e) making changes to this Operating Agreement, and f) other duties agreed upon by the Manager and the Advisory Board.

G.     It is agreed that the Member shall begin with Percentage Interests in the Company of 100%. Pursuant to separate agreements approved by the Manager, certain persons, entities, consultants and contractors of the Company may have options to acquire voting Membership interests in the Company up to 10% in the aggregate, as approved by a unanimous vote of the Member. Each Member's Percentage Interest shall be diluted equally and alike if additional cash is brought into the Company by a new Member.

H.     The Company shall have an initial valuation of $ 50,000,000.00 (Fifty Million Dollars).

I.     New Members investing for Membership, or holding options to acquire Membership interests shall have voting rights, based on the percentage of Membership owned at the time any vote is held.

J.     The Company cannot be sold without the unanimous vote of its Members.

K.     No Member may be diluted, ("watered down"), once invested, excluding the Managing Member. Excluding the Managing Member, no Members percentage of ownership shall be reduced for any reason during the Term of this Agreement.

L.     Each Member admitted under this Agreement shall receive founders shares ("original shares") in Inductance Energy Corporation, ("IEC"), the SCE, a Wyoming corporation, equal to their holding in the Company. As an example, if a Member of the Company holds one percent (1%) Membership in the Company, then that person or entity shall receive one percent (1%) of IEC. IEC shall be the production corporation to be formed no later than March 10th, 2017. IEC shall be granted the worldwide, exclusive license by the Company to design, improve, manufacture, market, advertise, sell, rent, or lease the Engine under the terms of the license agreement granted to IEC by the Company. IEC shall have the right under the license to sub-contract the manufacture of certain parts and assemblies of the Engine. It is understood by the Members of the Company that IEC will be raising substantial equity and debt financing to manufacture the Engine and that unlike Membership in the Company, ownership in IEC is subject to dilution.

M.     All Members of the Company shall receive a thirty (30) day right of first refusal on any new equity offering to be made by IEC under the terms of the licensing agreement to IEC by the Company.

N.     No Later than March 17th, Members of the Company shall craft an Option Plan that in each and every Member of the Company can obtain options for common shares in IEC, and that those options shall not expire prior to March 16, 2020. The Option Plan shall also allow the options to be fully transferable by each member of the Company.

O.     The Company is entitled to and shall collect a Royalty from IEC, during the Term of this Agreement in the amount of six percent (6%) of the gross revenue (sales) from any source collected by IEC, excluding investments in IEC. The Royalty shall be calculated monthly and paid to the Company by IEC no later than the 15th day of the month following the month in which the revenue was collected by IEC. The Royalty shall be paid out as follows; (1) Fifty percent (50%) of the Royalty shall be paid to DAS or its assigns, and (2) Fifty percent (50%) shall be paid out to the other Members in proportion to their ownership in the Company. As an example if IEC pays a monthly Royalty of $ 100,000.00 to the Company; 50% or $ 50,000.00 (Fifty Thousand Dollars) would be paid to DAS, and the remaining 50% or $ 50,000.00 (Fifty Thousand Dollars) would be paid to the other Members of the Company based on their ownership. If a Member owned 2% of the Company, (20% of the 10% offered for sale) then that Member would own and collect 20% of the remaining Royalty, or $ 10,000.00 (Ten Thousand Dollars).

- 2 -

WYOTECH00001033

P.     Any and all Royalties, (excluding five percent (2%) of the monthly total, which shall be held back for Company meetings, legal fees, and other operating expenses), collected by the Company shall be distributed to the Members on the 15th day following the month collected. As an example, if $ 100,000.00 (One Hundred Thousand Dollars) are collected in the month of June of 2018, then $ 95,000.00 must be distributed to the Membership in the form of a Company check no later than July 15th, 2018.

1.01     Definitions.     The following terms used in this Operating Agreement shall have the following meanings:

(a)     "**Act**" shall mean the Wyoming Limited Liability Company Act, WS 17-29-101 through 17-29-1105.

(b)     "**Approved Business Plan**" means the business plan attached as Exhibit B.

(c)     "**Approved Operating Budget**" means the operating budget attached as Exhibit C.

(d)     "**Certificate of Formation**" shall mean the Certificate of Formation of WYO TECH INVESTMENTS GROUP, LLC as filed with the Secretary of State of Wyoming, as amended from time to time.

(e)     "**Capital Account**" as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to such date pursuant to Article 8.

(f)     "**Capital Contribution**" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made. "**Initial Capital Contribution**" shall mean the Initial Capital Contributions to be made by the Managing Member pursuant to the Approved Business Plan.

(g)     "**Code**" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(h)     "**Company**" shall refer to WYO Tech Investment Group, LLC.

(i)     "**Deficit Capital Account**" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(1)     credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2 (g) (1) and (i) (5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(2)     debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii) (d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(j)     "**Distributable Cash**" shall mean all cash, revenues and funds received by the Company from Company operations, and less the sum of the following to the extent paid or set aside by the

- 3 -

WYOTECH00001034

Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the customary and normal operation of the Company's business; (iii) such Reserves as the Manager deem reasonably necessary for the prudent operation of the Company's business.

(k)     "**Economic Interest**" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Member or Manager.

(l)     "**Economic Interest Owner**" shall mean the owner of an Economic Interest who is not a Member.

(m)     "**Entity**" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

(n)     "**Gifting Member**" shall mean any Member or Economic Interest Owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest.

(o)     "**Intellectual Property**" shall mean any foreign or domestic patent, trademark, invention, trade secret, process, pattern, drawing, or improvement to the Engine or components related to the Engine.

(p)     "**Interest Holder**" shall mean either a Member holding an Economic Interest or an Economic Interest Owner.

(q)     "**Majority Interest**" shall mean one or more Interests of Member which in the aggregate exceed fifty percent (50%) of all Percentage Interests.

(r)     "**Manager**" shall mean Danzik Applied Sciences, LLC and may include others from time to time as determined by the Manager. As used in this Agreement, the phrase "**approved by the Manager**" and similar phrases means that a particular action or decision requires approval by the Manager,".

(s)     "**Managing Member**" shall mean Danzik Applied Sciences, or temporary or interim Managers from time to time as determined by the Managing Member.

(t)     "**Member**" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become Member. To the extent a Manager has purchased a Membership Interest in the Company, he or she will have all the rights of a Member with respect to such Membership Interest, and the term "**Member**" as used herein shall include a Manager to the extent he, she or it has purchased such Membership Interest in the Company. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(u)     "**Membership Interest**" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Member granted pursuant to this Operating Agreement and the Act.

- 4 -

WYOTECH00001035

(v) "**Net Profits**" and "**Net Losses**" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles employed under the cash method of accounting at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

(w) "**Operating Agreement**" shall mean this Operating Agreement as originally executed and as amended from time to time as approved by the Manager.

(x) "**Percentage Interest**" shall mean, for any Member, the percentage interest in the Company as set forth on Exhibit A, as may be changed from time to time by the unanimous vote of the Managing Member.

(y) "**Persons**" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "**Person**" where the context so permits.

(z) "**Reserves**" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts approved by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

(aa) "**Royalty**" shall mean the six percent (6%) Royalty that shall be collected monthly from each and every licensee of the Company's technology during the Term of this Agreement.

(bb) "**Selling Member**" shall mean any Interest Holder which sells, assigns, pledges, hypothecates or otherwise transfers for consideration all or any portion of its Membership Interest or Economic Interest.

(cc) "**Transferring Member**" shall collectively mean a Selling Member and a Gifting Member.

(dd) "**Treasury Regulations**" shall include proposed, temporary and final regulations promulgated under the Code.

(ee) "**Unanimous Vote**" shall mean 100% of the Membership.

(ff) "**Withdrawal Event**" shall occur upon the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which terminates the continued Membership of a Member in the Company.

## ARTICLE 2.
## FORMATION OF COMPANY

2.01 Formation. WYO Tech Investments Group, LLC has been organized as a Wyoming Limited Liability Company by executing and delivering a Certificate of Formation to the Wyoming Secretary of State in accordance with and pursuant to the Act.

2.02 Name. The name of the Company is WYO Tech Investments Group, LLC. The name of the Company may be changed at any time as approved by the Manager.

2.03 Principal Place of Business and Secondary Place of Business. The principal place of business of the Company within the State of Wyoming shall be 1108 14th Street, Cody, Wyoming 82414. The Company may locate its places of business and registered office at any other place or places as the Manager may deem advisable.

- 5 -

WYOTECH00001036

The Secondary Place of Business shall be 7900 East Greenway Road, Suite 103, Scottsdale, Arizona 85260.

2.04    Registered Office and Registered Agent.   The Company's initial registered office in the State of Wyoming shall be at the office of its registered agent at 412 N Main, Suite 100, Buffalo, Wyoming 82834, and the name of its initial registered agent shall be Registered Agents, Inc.  The registered office and registered agent may be changed by filing the address of the new registered office and/or the name of the new registered agent with the Wyoming Secretary of State pursuant to the Act.

2.05    Term.   The term of the Company shall be from September 1, 2016 to August 31, 2116, unless the Company is earlier dissolved by the Manager, or in accordance with either the provisions of this Operating Agreement or the Act.  The Term can be extended to any length of time by a unanimous vote of the Members.

2.06    Investment Purposes.   Each Member represents that they, he, she or it is acquiring its, his or her Member's Interest in the Company for its, his or her own account as an investment and without an intent to distribute such Interest.  The parties acknowledge that Member' Interests in the Company, to the extent considered to be securities, have not been registered under the Securities Act of 1933 or any state securities laws, and may not be disposed of by any Member without appropriate registration or the availability of an exemption from such requirement.

### ARTICLE 3.
### BUSINESS OF COMPANY

3.01    To acquire, hold and protect intellectual property concerning the Engine as well as patents, and continuations in part that may arise in the future. Also, any lawful business whatsoever, or which shall at any time appear conducive to or expedient for the protection or benefit of the Company and its assets.

Operation of the Company shall be conducted in accordance with the Approved Business Plan, the Approved Operating Budget which shall be drafted and put in place with the approval of the Majority of the Advisory Board no later than June 1, 2017 and such decisions as are made from time to time by the Manager, Advisory Board and/or the Members, as provided in this Operating Agreement.

### ARTICLE 4.
### NAMES AND ADDRESSES OF MANAGING MEMBER

The names and addresses of the Member are as follows:

1.    Danzik Applied Sciences, LLC        1108 14th Street, Cody, Wyoming 82414

### ARTICLE 5.
### RIGHTS AND DUTIES OF MANAGER

5.01    Management.   The business and affairs of the Company shall be managed by its Manager.  The Manager shall direct, manage and control the business of the Company.  The unanimous approval of the Manager is required for the following; 1) to amend this Operating Agreement, with the Unanimous Vote of all the Members, 2) addition of any new Member, 3) continuance of this Operating Agreement past August 31, 2116. No debt shall be contracted or liability incurred by or on behalf of the

- 6 -

WYOTECH00001037

CONFIDENTIAL

Company except as provided herein and approved by Unanimous Vote. Except for situations in which the Unanimous Vote or approval by a Majority Interest is expressly required by this Operating Agreement or by non-waivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At all times there shall be a Manager. The Manager may take any action permitted to be taken by the Manager or when approval by the Manager is expressly required pursuant to this Operating Agreement or the Act. Without limiting the generality of the foregoing, Manager must approve and shall have power and authority, on behalf of the Company with the Unanimous Vote to:

(a) To acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member;

(b) To purchase liability and other insurance to protect the Company's property and business;

(c) To hold and own Company real and personal properties in the name of the Company;

(d) To invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

The Manager shall have the right and authority to act without a vote to;

(e) To execute on behalf of the Company all instruments and documents, including, without limitation, checks; bank wires; travel expenses; publish financial statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale; leases; and any other instruments or documents necessary to the business of the Company;

(f) To employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(g) To enter into any and all other agreements on behalf of the Company, excluding debt of any kind whatsoever, in such forms as the Manager may approve; and

(h) To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

5.02 Number, Tenure and Qualifications. The Company shall initially have one (1) Manager, as set forth on Exhibit A. Manager shall continue to qualify as a Manager for so long as the Managing Member corresponding to such Manager remains eligible to vote on matters properly before the Membership.

5.03 Certain Powers of Manager. The following actions of the Manager shall require a Unanimous Vote of the Members:

(a) To borrow money for the Company, from Members. The Manager may not borrow from banks, other lending institutions.

(b) The Manager, Member, or affiliates of the Manager or Member is forbidden, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums or;

(b) To sell or otherwise dispose of any assets of the Company, including any Intellectual Property, specifically the Engine, as part of a single transaction or plan; and

- 7 -

QB\159654.00003\39748777.2

WYOTECH00001038

(c)     To set and pay the salaries and other compensation of the Manager, and any other employee of the Company. No Manager shall receive a salary or other compensation, other than day to day business operation expense reimbursements.

5.04     Unless authorized to do so by this Operating Agreement or by the Manager of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.05     Liability for Certain Acts. Manager shall perform his, her or its duties as Manager in good faith, in a manner he, she or it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

5.06     Manager Have No Exclusive Duty to Company. The Manager shall not be required to manage the Company as their sole and exclusive functions and they may have other business interests and engage in activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

5.07     Bank Accounts. The Manager must approve and may from time to time open bank accounts in the name of the Company. The Manager shall be the sole signatory(ies) thereon, unless a Majority Interest determines otherwise.

5.08     Indemnity of the Manager, Employees and Other Agents. Provided that Member owning a Majority Interest approve, the Company shall, to the maximum extent permitted under the Act, indemnify all of the Manager, Member, employees and other agents.

5.09     Resignation. Any Manager of the Company may resign at any time by giving written notice to the Member of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

## ARTICLE 6.
## RIGHTS AND OBLIGATIONS OF MEMBER

6.01     Limitation of Liability. Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

6.02     Company Debt Liability. A Member will not be personally liable for any debts or losses of the Company beyond his or her respective Capital Contributions and any obligation of the Member under Sections 8.01 and 8.02 to make Capital Contributions, except as provided in Section 6.07 or as otherwise required by law.

6.03     List of Member. Upon the written request of any Member, the Manager shall provide a list showing the names, addresses and Membership Interests and Economic Interests of all Members. Members herein agree to keep Members names, addresses and other contact information confidential and shall not disclose Member information to any third party unless ordered to do so by a court of competent jurisdiction.

- 8 -

QB\159654.00003\39748777.2

WYOTECH00001039

6.04    Company Books. The Manager shall maintain and preserve, during the term of the Company, the accounts, books, and other relevant Company documents described in Section 9.09. Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours, as reasonably determined by the Manager(s), to inspect and copy, at the requesting Interest Holder's expense, the Company documents identified in Section 18-305 of the Act, and such other documents which the manager, in his or her discretion, deems appropriate.

6.05    Priority and Return of Capital. Except as may be expressly provided in Article 9, no Interest Holder shall have priority over any other Interest Holder, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to loans which a Member has made to the Company.

6.06    Liability of a Member to the Company. A Member who receives a distribution or the return in whole or in part of its Capital Contributions is liable to the Company only to the extent provided by the Act.

## ARTICLE 7.
## MEETINGS OF MEMBER

7.01    Meetings. Meetings of the Member, for any purpose or purposes, may be called by any Manager or by any Member or Member holding at least 60% of the Percentage Interests.

7.02    Place of Meetings. The Majority Interest may designate any place, within the State of Wyoming, State of Arizona or other location as the place of meeting for any meeting of the Membership. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal place of business of the Company in the State of Wyoming.

7.03    Notice of Meetings. Except as provided in Section 7.04, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five (5) nor more than ten (10) days before the date of the meeting, either personally or by mail, or by email by or at the direction of the Manager or Member or Member calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

7.04    Meeting of All Member. If all of the Member shall meet at any time and place, either within or outside of the State of Wyoming, and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.05    Record Date. For the purpose of determining Member entitled to notice of or to vote at any meeting of Member or any adjournment thereof, or Member entitled to receive payment of any distribution, or in order to make a determination of Member for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Member. When a determination of Member entitled to vote at any meeting of Member has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.06    Quorum. Member holding seventy-five percent (75%) of all Percentage Interests in the Company, represented in person or by proxy, shall constitute a quorum at any meeting of Member. Members may participate in any Membership meeting by telephone, teleconference, or video conference. In the absence of a quorum at any such meeting, a majority of the Percentage Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally

- 9 -

QB\159654.00003\39748777.2

WYOTECH00001040

noticed. The Member present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Percentage Interests whose absence would cause loss of a quorum.

7.07    Manner of Acting. If a quorum is present, the affirmative vote of Member holding a Majority Interest shall be the act of the Member, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Certificate of Formation, or by the Operating Agreement. Unless otherwise expressly provided herein or required under applicable law, only Member who have a Membership Interest may vote or consent upon any matter and their vote or consent, as the case may be, shall be counted in the determination of whether the matter was approved by the Member.

7.08    Proxies. At all meetings of Member, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.09    Action by Member Without a Meeting. Action required or permitted to be taken at a meeting of Member may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Manager of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when all Member entitled to vote have signed the consent, unless the consent specifies a different effective date.

7.10    Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

7.11    Telephonic Meetings. A Member may participate in a meeting of Member by means of conference telephone or similar communications equipment enabling all Member participating in the meeting to hear one another. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

## ARTICLE 8.
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

8.01    Member' Capital Contributions. As and when requested by the Manager, each Member shall contribute up to such amount as is set forth in Exhibit A hereto as its share of the Initial Capital Contribution.

8.02    Additional Contributions. A Member shall not be required to make additional Capital Contributions.

8.03    Capital Accounts.

(a)    A separate Capital Account will be maintained for each Member. Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of Net Profits and Net Losses; and (4) allocations to such Member of income described in Code Section 705(a)(1)(B). Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of expenditures described in Code Section 705(a)(2)(B); and (4) allocations

- 10 -

WYOTECH00001041

CONFIDENTIAL

to the account of such Member of Company loss and deduction as set forth in such Regulations, taking into account adjustments to reflect book value.

(b)    In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this Section 8.03 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.03 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.03, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Member as set forth in the Operating Agreement.

(d)    Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Member and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (20) days after the date of the liquidation).  The Company may offset damages for breach of this Operating Agreement by an Interest Holder whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(e)    Except as otherwise required in the Act (and subject to Sections 8.01 and 8.02), no Interest Holder shall have any liability to restore all or any portion of a deficit balance in such Interest Holder's Capital Account.

8.04    Withdrawal or Reduction of Member' Contributions to Capital:

(a)    A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Member on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)    A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution and the Member's right to it portion of the Royalty.

## ARTICLE 9.
## ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

9.01    Allocations of Profits and Losses from Operations.  The Net Profits and Net Losses of the Company for each fiscal year will be allocated as follows:

a) Allocated according to the Royalty agreements as described herein.

b) Allocated according to the Percentage Interest of each Member.

- 11 -

WYOTECH00001042

9.02    Special Allocations to Capital Accounts. Notwithstanding Section 9.01 hereof:

(a)    No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Member which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Member exist, then to the Member in accordance with their interests in Company profits pursuant to Section 9.01.

(b)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 9.02(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1 (b) (2) (ii) (d) of the Treasury Regulations.

(c)    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)    Notwithstanding any other provision of this Section 9.02, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Account of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 9.02(d) is intended to comply with the minimum gain charge back requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, and the minimum gain charge back requirement would cause a distortion in the economic arrangement among the Member and it is not expected that the Company will have sufficient other income to correct that distortion, the Manager may in their discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain charge back requirement in accordance with Treasury Regulation Section 1.704-2(f)(4).

(e)    Items of Company loss, deduction and expenditures described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Member' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f)    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Member in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g)    In accordance with Code Section 704(c)(1)(A) and Section 704-1(b)(2)(i)(iv) of the Treasury Regulations, if a member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property

- 12 -

WYOTECH00001043

shall, solely for federal income tax purposes, be allocated among the Member so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)     Pursuant to Code Section 704(c)(1)(B), if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Code Section 704(c)(2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(i)     In the case of any distribution by the Company to an Interest Holder, such Interest Holder shall be treated as recognizing gain in an amount equal to the lesser of:

(1)     the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

(2)     the Net Precontribution Gain (as defined in Code Section 737(b)) of the Interest Holder. The Net Precontribution Gain means the net gain (if any) which would have been recognized by the distributee Interest Holder under Code Section 704(c)(1)(B) of all property which (a) had been contributed to the Company within five years of the distribution, and (b) is held by the Company immediately before the distribution, if such property had been distributed by the Company to another Interest Holder. If any portion of the property distributed consists of property which had been contributed by the distributee Interest Holder to the Company, then such property shall not be taken into account under this Section 9.02(i) and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

(j)     In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Interest Holder as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Interest Holder (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Member shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1 (b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Member in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Member' shares of tax items under Code Section 704(c).

(k)     All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Member to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(l)     Any credit or charge to the Capital Accounts of the Member pursuant to Sections 9.02(b), (c), and or (d), hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.01, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.01 and 9.02 shall to the extent possible, be equal to the net amount

- 13 -

WYOTECH00001044

that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article 9 if the special allocations required by Sections 9.02(b), (c), and/or (d), had not occurred.

9.03    Distributions. Except as provided in Section 8.03(d), a Member has no right to demand and receive any distribution in a form other than cash. All distributions of cash or other property shall be made to the Member pro rata, first, in proportion to their interests in Net Profits and Net Losses under Section 9.01, and second in proportion to the respective Percentage Interests of the Member, on the record date of such distribution. Except as provided in Section 9.04, all distributions of Distributable Cash and property shall be made at such time as determined by the Manager. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Member from the Company shall be treated as amounts distributed to the relevant Member or Member pursuant to this Section 9.03.

9.04    Limitation upon Distributions.

(a)    No distributions or return of contributions shall be made and paid if, after the distribution or return of distribution is made either

(1)    the Company would be insolvent based on cash basis accounting; or

(2)    the net assets of the Company would be less than zero based on cash basis accounting.

(b)    A determination approved by the Manager that a distribution or return of contribution may be made under Section 9.04(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

9.05    Accounting Principles. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the cash method of accounting.

9.06    Interest on and Return of Capital Contributions. No member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

9.07    Loans to Company. Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company. Such loans shall bear interest at the prime rate in effect from time to time plus one percent.

9.08    Accounting Period. The Company's accounting period shall be the calendar year ("**Fiscal Year**").

9.09    Records, Audits and Reports. At the expense of the Company, the Manager shall maintain records and accounts of the operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

(a)    A current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became an Interest Holder;

(b)    A copy of the Certificate of Formation of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

- 14 -

QB\159654.00003\39748777.2

WYOTECH00001045

(c)     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the eight (8) most recent years;

(d)     Copies of the Company's currently effective written Operating Agreement, and copies of any financial statements of the Company for the three most recent years;

(e)     Minutes of every Member' meeting;

(f)     Any written consents obtained from Member for actions taken by Member without a meeting; and

(g)     Unless contained in the Certificate of Formation, the Approved Business Plan, the Approved Operating Budget, or elsewhere in this Operating Agreement, a writing prepared by the Manager setting out the following:

(1)     The times at which or events on the happening of which any additional Capital Contributions agreed to be made by each Member and Economic Interest Owner are to be made.

(2)     Any right of an Interest Holder to receive distributions that include a return of all or any part of the Interest Holder's contributions.

(3)     Any power of an Interest Holder to grant the right to become an assignee of any part of the Interest Holder's interest, and the terms and conditions of the power.

9.10    Returns and other Elections.  The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Member within a reasonable time after the end of the Company's fiscal year upon the Member' written request.  All elections permitted to be made by the Company under federal or state laws shall be made by the Manager in their sole discretion, provided that the Manager shall make any tax election requested by Member owning a Majority Interest.

9.11    Tax Matters Partner.  DAS is designated the "**Tax Matters Partner**" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Member agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.

## ARTICLE 10.
## TRANSFERABILITY

10.01   General.  Except as otherwise specifically provided herein, any Interest Holder of any Membership, shall have the right, as to all or any part of its Membership Interest or Economic Interest at any time to;

(a)     sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration, (collectively, "sell"); or

(b)     gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy).

- 15 -

WYOTECH00001046

CONFIDENTIAL

10.02   Sale by 10% or Less Holder. Any Member holding a total of 10% or less of the total Membership may sell any portion or all of their Membership Interest with a thirty (30) day written notice to the Manager.

(a) Any prospective new Member purchasing 10% or less of the total Membership must agree in writing without qualification, (3) three days in advance of any purchase, that they or their entity will agree to the terms and conditions of this Operating Agreement, or the then current Operating Agreement of the Company, without modification or change on the day the Membership Interest is made and before the Membership Interest in the Company is transferred from the current Member to the new Member or Members.

10.03   Right of First Refusal.

(a)   If a selling Member desires to sell all or any portion of its Membership Interest or Economic Interest in the Company to a third party purchaser, the selling Member shall obtain from such third party purchaser a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered. The selling Member shall give written notification to the remaining Member (s), by certified mail or personal delivery, of its intention to so transfer such interest, furnishing to the remaining Member a copy of the written offer to purchase such interest, and the name and business and personal addresses of the proposed transferee.

(b)   Primary Option to Purchase. Within thirty-five (35) days of the receipt of the notice of intention to transfer a Percentage Interest by the last of the Member(s) to receive such notice, each remaining Member may exercise an option to purchase that proportion of the Percentage Interest proposed to be transferred which equals the proportion which the Percentage Interest owned by such remaining Member at the time of his or her receipt of the notice is of the total of the Percentage Interests then owned by all the remaining Member. The purchase option granted in this paragraph is herein referred to as the "**Primary Option**."

(c)   Secondary Option to Purchase. If a Member fails to exercise a Primary Option granted to him or her to purchase the Percentage Interest proposed to be transferred, each remaining Member who is granted and who exercises a Primary Option may, within ten (10) days after the expiration of the 35-day option period provided for above, exercise an option to purchase the Percentage Interest with respect to which such Member has failed to exercise his or her Primary Option (hereinafter the "**Option Interest**"). In the case of a single remaining Member, his or her option shall be to purchase all of the Option Interest. In the case of two or more remaining Member, each such remaining Member's option shall be to purchase the portion of Option Interest which bears the same proportion to the total Option Interest as the Percentage Interest owned by each such remaining Member at the time of receipt of the notice provided for above bears to the total Percentage Interest then owned by all such remaining Member; provided that all such remaining Member may, by agreement among themselves, determine the proportions in which some or all of their number may exercise the option granted in this paragraph. The purchase option granted by this paragraph is referred to as the "**Secondary Option**."

(d)   In the event the remaining Member (or any one or more of the remaining Member) give written notice to the selling Member of their desire to exercise this right of first refusal and to purchase all of the selling Member's interest in the Company which the selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Member shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after written notification to the Selling Member of the remaining Member or Member' election to exercise their right of the first refusal.

(e)   As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's interest in the Company by a third party purchaser or the gift of an interest in the Company (including an Economic Interest), (subject to Section 10.03) substitution of a new

- 16 -

WYOTECH00001047

Member, the remaining Member may require the Selling Member, Gifting Member or the proposed purchaser, or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the remaining Member such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the remaining Member may deem necessary or desirable to:

(1)    verify the purchase, gift or transfer, as the case may be;

(2)    confirm that the person desiring to acquire an interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of the Operating Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner);

(3)    maintain the status of the Company as a partnership for federal tax purposes; and

(4)    assure compliance with any applicable state and federal laws including securities laws and regulations.

(f)    Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article 10 shall be deemed effective as of the last day of the calendar month in which the remaining Member' consent thereto was given, or, if no such consent was required pursuant to Section 10.03(e), then on such date that the successor interest complies with the conditions set forth in Section 10.03(c). The Selling Member agrees, upon request of the remaining Member, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Member from time to time in connection with such sale, transfer, assignment, or substitution. The selling Member hereby indemnifies the Company and the remaining Member against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article 10.

10.04    Transferee Not Member in Absence of Unanimous Consent.

(a)    Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.03 hereof), if all of the remaining Members do not approve by unanimous written consent of the proposed sale or gift of the Transferring Member's Membership Interest or Economic Interest to a transferee which is not a Member immediately prior to the sale or gift, then the proposed transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the Member) shall be effective unless and until written notice (including the name and address of the proposed transferee (and the date of such transfer) has been provided to the Company and the non-transferring Member(s).

(b)    Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interest which were owned by the Transferring Member immediately prior to such sale or gift or which were associated with the transferred Economic Interest shall immediately lapse until either (1) the remaining Member, by unanimous consent, reinstate such rights to the Economic Interest Owner who did not previously obtain the unanimous written consent of the Member or (2) upon the remaining Member, by unanimous written consent, reinstating such rights to a successor or transferee of such Economic Interest Owner.

- 17 -

WYOTECH00001048

## ARTICLE 11.
## ADDITIONAL MEMBER

11.01    From the date of the formation of the Company, any Person or Entity acceptable to the Manager may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Manager shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. No new Member shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager(s) may, at their option, at the time a Member is admitted, close the Company books (as though the Company's tax year has ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE 12.
## DISSOLUTION AND TERMINATION

12.01    Dissolution.

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(1)    By the written agreement of the Manager with the unanimous consent of the Members; or

(2)    Upon the happening of a Withdrawal Event of all of the Members, unless the business of the Company is continued by the consent of a Majority Interest within ninety (90) days after the Withdrawal Event.

(b)    Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Member owning Percentage Interests which in the aggregate constitute not less than one hundred percent of the Percentage Interest vote to dissolve the Company at a meeting of the Company pursuant to Article 7, then all of the Member shall agree in writing to dissolve the Company on the date agreed upon or in the event of no agreement, as soon as possible, but in any event not more than thirty (30) days thereafter.

(c)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him or her to be incompetent to manage his or her person or his or her property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his or her estate or administering his or her property.

(d)    A Member shall not take any voluntary action which directly causes a Withdrawal Event. Unless otherwise approved by Member owning a Majority Interest, a Member who resigns (a "**Resigning Member**") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner. Damages for breach of this Section 12.01(d) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

- 18 -

WYOTECH00001049

12.02    Winding Up, Liquidation and Distribution of Assets.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Manager shall:

(1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Member in kind),

(2)    Allocate any profit or loss resulting from such sales to the Member' and Economic Interest Owners' capital Accounts in accordance with Article 9 hereof.

(3)    Discharge all liabilities of the Company, including liabilities to Member and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Member and Economic Interest Owners for Distributions, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Member and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company),

(4)    Distribute the remaining assets in the following order:

(i)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Member. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Member and Economic Interest Owners shall be adjusted pursuant to the provisions of Article 9 and Section 8.03 of this Operating Agreement to reflect such deemed sale.

(ii)    The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Member, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.02(b)(i). Any such distributions to the Member in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(c)    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1 (b) (2) (ii) (g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)    The Manager(s) shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

- 19 -

QB\159654.00003\39748777.2

12.03    Certificate of Cancellation. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, Certificate of Cancellation as required by the Act, shall be executed in duplicate and filed with the Wyoming Secretary of State.

12.04    Effect of Filing of Certificate of Cancellation. Upon the filing of Certificate of Cancellation with the Wyoming Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

12.05    Return of Contribution Nonrecourse to Other Member. Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Member, such Member or Member shall have no recourse against any other Member, except as otherwise provided by law.

## ARTICLE 13.
## MISCELLANEOUS PROVISIONS

13.01    Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement shall be deemed to have been sufficiently given or served for all purposes if (1) either by actual delivery of the notice into the hands of the parties thereunto entitled; (2) or by the mailing of the notice in the U.S. mail, certified mail, return receipt requested; or (3) sent by nationally recognized, overnight delivery service, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. The notice shall be deemed to be received in case (1) on the date of its actual receipt by the party entitled thereto and in cases (2) or (3) on the date of its mailing or deposit with such delivery service. The failure or refusal of any party to accept any notice given pursuant to this paragraph shall be conclusively deemed receipt thereof and knowledge of its contents.

13.02    Books of Account and Records. Proper and complete records and books of account shall be kept or shall be caused to be kept by the Manager in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 9.09. The books and records shall at all times be maintained at the principal place of business of the Company.

13.03    Application of Wyoming Law. This Operating Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Wyoming, and specifically the Act.

13.03    Waiver of Action for Partition. Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

13.04    Amendments. This Operating Agreement may not be amended except in writing by the Manager. Any amendment changing the Percentage Interests of the Member requires the unanimous vote of the Managing Member.

13.05    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

- 20 -

QB\159654.00003\39748777.2

CONFIDENTIAL

13.06    Construction.  Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.07    Headings.  The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

13.08    Waivers.  The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

13.9    Rights and Remedies Cumulative.  The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy.  Said rights and remedies are given in addition to any other legal rights the parties may have.

13.10    Severability.  If any provision of this Operating Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

13.11    Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

13.12    Creditors.  None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

13.13    Counterparts.  This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

13.14    Entire Agreement.  This Operating Agreement supersedes all agreements previously made between the parties relating to its subject matter.  There are no other understandings or agreements between them.  It contains the entire agreement of the parties.  It may not be changed orally but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

13.15    Joint Preparation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

13.16    Incorporation of Exhibits, Annexes and Schedules.  The Exhibits, Annexes and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

### [REMAINDER OF PAGE INTENTIONALLY BLANK]

QB\159654.00003\39748777.2

WYOTECH00001052

IN WITNESS WHEREOF, the parties hereto have caused their signatures, or the signatures of their duly authorized representatives, to be set forth below on the day and year first above written.

DANZIK APPLIED SCIENCES, LLC

By: _____

Name:   Elizabeth J. Danzik
        Danzik Applied Sciences, LLC
Title:  Managing Member

QB\159654.00003\39748777.2

WYOTECH00001053

**EXHIBIT A**

Percentage Interests of Member
and List of Manager/Representatives
Effective as of September 1, 2016

| NAME | Description of Initial Capital Contribution | Amount | Initial Percentage Interest |
|---|---|---|---|
| Danzik Applied Sciences, LLC | Cash and Intellectual Property | Up to $3,000,000.00 | 100% |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| Held for Employees and Contractors | Labor | | 0% |

**List of Manager/Representatives:**

Elizabeth J Danzik
for
Danzik Applied Sciences, LLC

CONFIDENTIAL

WYOTECH00001054