# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **Wells Fargo Bank NA,** | ) | |
| | ) | No.  **CV-17-4140-PHX-DWL** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | May 29, 2019 |
| **Wyo Tech Investment** | ) | 2:59 p.m. |
| **Group LLC, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**ORDER TO SHOW CAUSE**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV-17-4140-PHX-DWL – May 29, 2019

1

2                        **A P P E A R A N C E S**

3

For Defendant Wyo Tech:
4         Wilenchik & Bartness
          By:  **Dennis Ira Wilenchik,** Esq.
5              **Tyler Swensen,** Esq.
               **Chris Meyers,** Esq.
6         2810 North 3rd Street, Suite 103
          Phoenix, Arizona 85004
7

For Defendants CWT Canada, Resources Recovery Corporation and
8    Jean Noelting:
          Ryan Rapp & Underwood
9         By:  **James Hendrik Taylor,** Esq.
          3200 North Central Avenue, Suite 2250
10        Phoenix, Arizona 85012

11        Schlam Stone & Dolan
          By:  **Joshua Wurtzel,** Esq. (Telephonically)
12        26 Broadway, Suite 1900
          New York, New York 10004

13

14

15

16

17

18

19

20

21

22

23

24

25

——— **CV-17-4140-PHX-DWL – May 29, 2019** ———

1      (Proceedings begin at 2:59 p.m.)

2          THE CLERK:  Civil case 17-4140, Wells Fargo Bank NA

3  versus Wyo Tech Investment Group, LLC and others.  Time set for

4  order to show cause hearing.

5          Counsel, please announce your presence for the record.    14:59:41

6          MR. SWENSEN:  Good afternoon, Your Honor, Tyler

7  Swensen, Dennis Wilenchik and Chris Meyers on behalf of

8  Wyo Tech.

9          THE COURT:  Good afternoon.

10         MR. TAYLOR:  Good afternoon, Your Honor, Henk Taylor,    14:59:54

11  local counsel for the CWT parties.

12         THE COURT:  Good afternoon.

13         MR. WURTZEL:  Good afternoon, Your Honor, this is

14  Joshua Wurtzel from Schlam Stone for the CWT parties.

15         Thank you for accommodating me by phone.              15:00:09

16         THE COURT:  Of course.  Good afternoon.

17         All right.  So we are here on -- for the following

18  matter:  On May 16th, in response to the CWT parties' amended

19  motion for an order to show cause, the Court issued a

20  seven-page order outlining its preliminary thoughts, and then    15:00:26

21  inviting further briefing from the parties.

22         Since then the Wilenchik parties filed a response to

23  the order, which is at docket number 140.  The CWT parties then

24  filed a reply yesterday, which ultimately got docketed at

25  docket 153.  And earlier today the Wilenchik parties filed a    15:00:49

CV-17-4140-PHX-DWL — May 29, 2019

1    court-authorized surreply at 152.

2            I've reviewed all of that, so I feel like I have a

3    pretty good handle on the issues.

4            In a moment I will start with the Wilenchik parties to

5    address some of the issues.  But before we get into the merits,     15:01:06

6    I just wanted to personally let Mr. Wilenchik know that I read

7    the motion, and I heard about your son's news, and I'm very

8    sorry to hear about that.

9            Mr. Wurtzel, I've had cases with Mr. Wilenchik before,

10   and I know him and his son, and I just wanted to express how       15:01:22

11   truly my condolences go out to your family.  That's awful news.

12           MR. WILENCHIK:  Thank you.

13           THE COURT:  All right.  Mr. Swensen, will you be

14   addressing the Court?

15           MR. SWENSEN:  Yes, I will, Your Honor.                     15:01:33

16           THE COURT:  Okay.

17           MR. SWENSEN:  Yes.  Thank you, Your Honor.

18           Not to belabor any point, but I want to start off by

19   first saying, I apologize for my handling of this situation.  I

20   am primarily if not exclusively responsible for the situation     15:01:58

21   that we find ourselves in here today.  And I don't try to

22   excuse or justify what happened.  I just want the Court to

23   understand, as I stated in my declaration, that there was no

24   intent to flout a court order or to behave in a contemptuous

25   manner on my part.  I may have been negligent or derelict in      15:02:21

1    what I was doing, but I definitely did not intentionally or

2    willfully try to disregard a court order.

3           What happened in short was, as the movie title A

4    Series of Unfortunate Incidents.  Starting with the fact that,

5    as the Court has pointed out, Mr. Wilenchik's son was diagnosed        15:02:41

6    with cancer in late March.  We also lost two attorneys from the

7    firm, one with notice, one without notice.  During that same

8    two-week period Mr. Wilenchik was on vacation in the

9    Mediterranean and basically out of touch for most of the time.

10          As a result of those events, a lot of responsibility        15:03:05

11    fell on me to take over a number of cases.  I tried to get

12    others involved in that, including one of the younger

13    associates, Mr. Turrentine, who handled the oral argument

14    before the Court on the motions that were pending at the time.

15    I believe that was at or around April 9th.        15:03:27

16          After the Court ruled on that, and I spoke to

17    Mr. Turrentine, I was under the impression, based on his

18    recitation of what had happened, that the Court had ruled --

19    and I believe Mr. Wurtzel stated something to this effect in

20    one of his emails, that the Court had said we're entitled to        15:03:45

21    discovery.  And that was the impression I got from

22    Mr. Turrentine, that CWT was entitled to continue on with its

23    discovery.

24          Based on that I made the -- my first mistake, I

25    assumed that we still had the right to make objections, and        15:04:02

6

1    that we were not being required to drop all objections and

2    answer everything as written.  But that the Court had ruled,

3    yes -- that -- my understanding of our motions was, we're

4    saying they shouldn't be entitled to any of this --

5           THE COURT:  Right.                                    15:04:25

6           MR. SWENSEN:  -- discovery.  And my understanding of

7    the Court's ruling was the Court said, yes, they are entitled

8    to some of this discovery, so you need to respond.

9           And in my looking at the issue, I came to the

10   erroneous conclusion that we were still entitled to make an    15:04:39

11   objection as to the expansive time frame.

12          And my understanding was that Beus Gilbert had not

13   received any payments within that -- what I defined as being

14   the shorter time frame.  And I created a declaration or a

15   response to the subpoena for Mr. Beus based on that            15:05:01

16   understanding.  And he reviewed it and signed it.  And his

17   statement was perfectly accurate, insofar as it went.

18          THE COURT:  Right.

19          MR. SWENSEN:  That was true.

20          But I should have followed up and read the order        15:05:13

21   myself in more detail and understood that.  I did not.

22          THE COURT:  And let me just interject on that.  I

23   understand your point.

24          And I will say at the outset, I appreciated the tone

25   that you took in your subsequent briefs with the Court.  And   15:05:25

1    it's hard when mistakes get made to own up to them, so I

2    appreciate the fact that you've been trying to do that.

3            With respect to the date limitation, I guess my

4    concern with it was more that we didn't -- I don't recall us

5    getting into one way or another at all during the hearing        15:05:42

6    whether -- you know, I officially ruled that you couldn't,

7    therefore, make a time limitation objection.

8            But it was just more broadly, from my experience, we

9    had already had a big series of briefing that the Court put a

10   lot of resources into it addressing your objections to the       15:05:59

11   subpoena.  It just seemed fairly self-evident to me that if you

12   have a full round of briefing and hearings on one set of

13   objections to discovery and the Court rules against you, you

14   then don't get to start Ground Hog Day and come up with a third

15   set of objections 30 days later and start the whole process      15:06:18

16   again.

17           MR. SWENSEN:  Right.  And I did not understand the

18   full history.  Had I been here at the oral argument -- like I

19   said, I did not jump into this case until probably about April

20   13th.  And that's when it started going round about, you know,    15:06:30

21   what do we do in this case, what do we do in that case?

22           By that point Mr. Wilenchik was back in town, but also

23   dealing with his son's condition and situation and was relying

24   heavily on me to carry the weight of multiple cases, actually,

25   one of which has been in litigation for ten years now, and it     15:06:46

1   is very complex.  And so I'm trying to get my arms around all

2   of that.

3           And to be honest, I mean, I basically took what I

4   thought would be kind of a shortcut or approach to say, all

5   right, let's just hold on to this one objection.  And as far as    15:07:04

6   I knew we hadn't received any payments up to that date, and

7   that Beus Gilbert hadn't.  And I said, let's do that as our

8   initial response.  If we get pushed back, then we'll talk about

9   it.

10          Didn't hear anything from opposing counsel afterwards.    15:07:17

11  Had many email exchanges about other discovery issues and other

12  issues with Mr. Wurtzel in the subsequent week -- or actually

13  almost three weeks, including, as the Court knows, we went into

14  this whole thing about the objections to the discovery requests

15  on Wyo Tech.                                                      15:07:39

16          THE COURT:  Right.

17          MR. SWENSEN:  And we had a May 1st teleconference.

18  And nothing ever came up about the subpoena on Wilenchik &

19  Bartness or Beus Gilbert at any time in any of that.

20          And so what I was thinking was, well, Mr. Wurtzel has     15:07:51

21  kind of let that go.  Because he had a -- at that point I

22  realized he was very tenacious about saying, you know, I'm

23  not -- I'm not happy with this, or I'm not happy with that, I

24  think you need to do more, or I object, or whatever.  So the

25  fact that I hadn't heard anything from him led me to believe      15:08:09

1    we're okay.

2          I had no idea that those responses on April 26th never

3    went out.  The first time I realized that was when we received

4    his initial motion for order to show cause.  And I immediately

5    went to our senior paralegal, Miss Stevens, and said, I thought    15:08:25

6    those went out.  Tell me before I respond back to him and say,

7    what are you talking about.

8          Because I could tell from reading that he was acting

9    like we hadn't responded at all.

10          THE COURT:  Right.                                         15:08:39

11          MR. SWENSEN:  And I went to her.  And we went back and

12    checked our emails.  And she actually found emails where she

13    had told -- I belive it was Jack Wilenchik had asked her, is

14    this taken care of?  And she said, yes, it's been sent to

15    opposing counsel.  But for whatever reason, it wasn't.  She      15:08:52

16    thought she had done it.  I thought she'd done it.

17          And that's when we said, oh, whoops.  Okay.  Here's

18    what we filed.  And immediately Mr. Wurtzel came back and said,

19    no, that's not acceptable.  And after going back and forth, and

20    I went back and looked at the Court's ruling, I said, yeah, I     15:09:10

21    can see where you have an objection.  Let's get you the

22    documents.

23          And I immediately on May 14th started that process of

24    trying to collate the documents and get them together, and be

25    responsive.  Both -- and I contacted Beus Gilbert and said, we   15:09:26

1    need to have anything you have, any payments.

2         And so we immediately started trying to address the

3    situation as best we could.  And so now we find ourselves here,

4    again, still at loggerheads over whether or not we've complied

5    with the subpoena.                                    15:09:50

6         I don't believe there's an issue as to Beus Gilbert

7    anymore.  I believe that Mr. Wurtzel has conceded that Beus

8    Gilbert is in compliance and did turn over everything that they

9    had.

10        So I'm not going to address that.  Just to reiterate    15:10:03

11   and say that Mr. Beus at no time -- he was relying solely on

12   me, and at no time did he ever make any misrepresentations to

13   the Court insofar as I know.  So I don't believe there's any

14   sanctions warranted against him or his firm.

15        As to where we are right now, I have been out of the    15:10:24

16   state for the last week, so if it's -- if the Court does not

17   mind, I would at a certain point here turn it over to

18   Mr. Meyers, who has been dealing with the ongoing objections to

19   our responses and our supplemental responses, et cetera,

20   because I'm not as aware of those -- all of those facts.    15:10:47

21        I will say though, I do know that everyone at

22   Wilenchik & Bartness has been trying since May 13th to fully

23   comply with the subpoena and produce everything in our records.

24        What I think opposing counsel fails to understand is,

25   with our particular system of bookkeeping, which I didn't    15:11:09

CV-17-4140-PHX-DWL – May 29, 2019

1   understand until I spoke to Miss Loftis, who handles all those

2   matters and all the banking, does not track payments coming in

3   by client matter unless the payment comes from that client on

4   that matter.

5           Here we have a situation where we have third parties,      15:11:34

6   Wyo Tech and Inductance, depositing funds into our trust

7   account for use on a variety of cases.  So those funds are not

8   tracked at that stage by matter, they're tracked by payor.

9   Which is, you know, the money came from Inductance and/or

10  Wyo Tech, or it came from Danzik Applied Sciences.             15:11:58

11          And so that maybe, I think, is part of what

12  Mr. Wurtzel is having difficulty with in trying to understand

13  our system.

14          So what we've given is everything we have in our

15  records.  The only thing that I believe he had an issue with    15:12:16

16  is -- well, there's a couple of things.

17          But one was, he took issue with us not providing the

18  account numbers for certain checks.  Well, we told him multiple

19  times, we don't keep those checks, we don't keep copies of

20  those checks in house.  We got copies of the checks from        15:12:34

21  Wyo Tech and Inductance, and the ones we got from them had that

22  information blanked out.

23          The only way we can get that information is to go to

24  our bank and specifically designate which checks we want copies

25  of.  We don't have online banking, we don't have an electronic  15:12:51

1    access.  That would require Miss Loftis to go in and look at

2    the bank statements, look at her ledgers, line up deposits with

3    checks, and then tell the bank, I want this check, this check,

4    this check, this -- which she has done.  But now they're

5    telling us, what, two weeks -- three weeks?                                    15:13:10

6              Yeah, they have to physically like go in and pull --

7              THE COURT:  What bank is this?

8              MR. MEYERS:  Northern Bank & Trust.

9              MR. SWENSEN:  Northern Bank & Trust.

10             THE COURT:  Okay.

11             MR. SWENSEN:  So it's not like Wells Fargo or B of A

12   and Chase.  I guess they have to physically go find these

13   records, or however they're stored, and get us copies of those.

14             But we have asked for them so we can provide that

15   information.                                                                   15:13:36

16             But that I think is a far cry from the case that

17   Mr. Wurtzel cited, holding that having online access means your

18   bank records are within your possession, custody and control.

19   I would agree with him with respect to like my own banking.  I

20   do bank with Chase, I can get my phone and pull up images of     15:13:54

21   checks in a matter of seconds.

22             Northern Bank & Trust, that's not possible.  So I

23   don't think we have a real apples to apples comparison there.

24             Ultimately, yeah, they might be in our control, but it

25   takes time to track them down and find them, they're not just    15:14:12

—CV-17-4140-PHX-DWL – May 29, 2019—

1    readily available.

2          So we are trying to comply to the best of our ability.

3          The other issue, though, that Mr. Wurtzel has raised

4    is with regard to these Danzik payments.  Well, that kind of

5    comes under the heading of no good deed goes unpunished, where      15:14:31

6    we inadvertently included in our production some deposit slips

7    and other information that showed payments from, quote, Danzik.

8          Well, that's not what the subpoena asked for, it asked

9    payments from Wyo Tech and Inductance.  These Danzik payments,

10   as far as I'm aware, came from Danzik Applied Sciences, and        15:14:50

11   they're not responsive to the subpoena.

12         Yet Mr. Wurtzel wants us to now prove a negative and

13   prove that those funds didn't come from Wyo Tech or Inductance.

14   And we've already told him, no, those are payments that came

15   from Danzik.  We inadvertently disclosed that, but -- and we       15:15:07

16   don't have copies of those checks either.  And we're not trying

17   to hide anything, but honestly it's not part of what the

18   subpoena asked for.

19         So we think we're going kind of far afield here to

20   have to respond to that demand.                                    15:15:25

21         THE COURT:  Okay.

22         MR. SWENSEN:  So beyond that, I don't have a whole lot

23   more to add, other than to say, again, there was no intention

24   to flout a court order.  I've been practicing for over 25

25   years, I've never been held in contempt, never even been          15:15:43

1    threatened with a contempt citation until this instance.  And I

2    certainly do not want to see that record changed in this

3    situation.  And I certainly don't want Mr. Wilenchik or the

4    firm to have to suffer because of my failure to dot all my Is

5    and cross all my Ts back in April 22nd -- or April 26th, excuse          15:16:05

6    me.

7              THE COURT:  Let me -- a question I have on my mind is,

8    fundamentally my overall objective here is I just want to make

9    sure all the discovery gets provided and the case gets back on

10   track.                                                                    15:16:21

11             But, a different issue here is, I think that the CWT

12   parties have had to incur some expense in filing motions and

13   bringing issues to the Court's attention.  I recognize your

14   position that at least some of these things in your view could

15   have been avoided through better meeting and conferring, and            15:16:39

16   possibly the Court didn't need to get burdened with it.

17             But nevertheless, you know -- let me say, you know, I

18   take everything you're saying in full -- give full credit to

19   the idea that this was not an intent to mislead, it was

20   negligence, it was a mistake.  I appreciate all of that.                15:16:59

21             But from the other side's perspective, it doesn't

22   really matter why it happened, it happened, and they've had to

23   really spin their wheels and file a bunch of briefs.

24             I think one of the arguments that Mr. Wurtzel might

25   make is, I understand that your accounting system in your firm         15:17:13

1    is difficult to figure out, and that explains why your initial

2    production, you missed some of these checks that they pointed

3    out.

4          But you shouldn't wait until after the compliance

5    deadline in a case where I already -- when we had the hearing,      15:17:25

6    I asked Mr. Turrentine, how long do you guys need?  I'll give

7    it to you.  He said, three weeks.  We gave him three weeks.

8    And only after that deadline passes and the errors start

9    manifesting do you even start trying to figure out how the

10   accounting system works.                                           15:17:41

11         So I guess from their perspective, they've had to

12   spend money filing briefs that truly they probably shouldn't

13   have needed to file because this stuff just should have -- you

14   know, had these negligent mistakes not been made, it never

15   would have come to this.                                           15:17:55

16         What am I supposed to do with an aggrieved party like

17   the CWT parties that have had to burn some money on filing on

18   motions that it's not really their fault that it had to happen?

19         MR. SWENSEN:  Well -- and I understand the Court's

20   position on that.  I guess I would, again, respectfully say        15:18:08

21   that I'm not sure that they had to file those motions.  I don't

22   think they had to file their reply.  I don't think they had

23   to -- it feels like piling on after a certain point.  Okay?

24   Because I don't think that Mr. Wurtzel's objections at this

25   stage are well taken as to what's been produced.  And it does      15:18:31

1  feel like piling on, to a certain extent.

2          Also, the fact that, you know, he was well aware that

3  he hadn't received anything from us and he waited

4  three -- almost three weeks, and didn't even bother to put an

5  email, where's your response?  Or pick up a phone or anything.          15:18:50

6  That kind of feels like, you know, lying in wait to pounce on

7  us.  And I understand --

8          THE COURT:  You know, when I've tried to think it

9  through, I think that there's an argument that the first motion

10  for an order to show cause they filed could have been avoided          15:19:07

11  through more meeting and conferring.

12          MR. SWENSEN:  Right.

13          THE COURT:  But then when you belatedly forwarded the

14  discovery that you thought had been sent a couple weeks

15  earlier, at that point they discovered that you had          15:19:20

16  unilaterally imposed this date limitation that shouldn't have

17  been in there.

18          And it strikes me that that was invariably going to

19  involve the Court at that point, because I think it's unlikely

20  that, had the CWT parties received your discovery responses on          15:19:34

21  April, and they started screaming bloody murder because you put

22  in this 2017 limitation that wasn't imposed, had they brought

23  that up to you privately instead of filing a motion, you would

24  have said, you know what, you're right, here's everything.

25          Just what I know about this case thus far is, that          15:19:52

1    strikes me as that one way or another was heading down the pike

2    for more litigation before the Court.  And, therefore, that

3    amended motion to compel they filed was something that it's

4    hard to blame them for filing it.

5            MR. SWENSEN:  Well, I can only ask the Court to take          15:20:07

6    my word for it, sincerely, that I would have done exactly what

7    I did had he called me and explained the situation after

8    reading our April 26 responses, I would have done exactly the

9    same thing I did, which was to immediately go and find all the

10   checks and documents that I could possibly find through the         15:20:28

11   entire date range.

12           The only reason I didn't look at those first was

13   because I was told -- I did go and talk to Miss Loftis about

14   all this, I said, did we receive any payments prior to this?

15   And she told me no.  That turned out to be incorrect.  There        15:20:43

16   was the one check for $10,000.  Which was a real problem

17   because we had a tough time figuring out where that check came

18   in and where it was accounted for.

19           But, yes, so there was -- there's not an effort on my

20   part to just, you know, say I'm not going to even bother with       15:21:02

21   this until they complain about it.  I thought I had a

22   legitimate objection to the scope.

23           And all I can tell -- ask the Court to do is believe

24   me when I say, if I had been told on April 27th, no, you're

25   wrong, look at the order it says this, I would have said, oh,       15:21:18

1    man, my bad, we'll get you that stuff immediately.  And I would

2    have gone and done exactly what I did on May 13th and 14th and

3    pulled those documents, and we would have had this

4    conversation.

5            And maybe -- would he have ultimately filed that            15:21:33

6    motion, after waiting a couple of days and not getting

7    everything that he thought he wanted?  Perhaps.  I don't know.

8    But I know what I would have done.  And that's all I can tell

9    the Court, is what I would have done in that situation.

10           And yeah, it's unfortunate.  I feel bad for what           15:21:48

11   happened.  And I understand the Court's position, that we

12   definitely messed up and should be perhaps something that has

13   to be done to pay for that.

14           THE COURT:  I guess a question I have on that, and I'm

15   still working this through, and I want to hear from Mr. Wurtzel   15:22:09

16   as well, but are you aware of any mechanism that would enable

17   the Court to order you to compensate the CWT parties for their

18   reasonable costs they've incurred in filing some of the motions

19   without making a formal contempt finding?

20           MR. SWENSEN:  You know, if the Court were to treat         15:22:39

21   this rather -- instead of a motion -- or contempt order, and

22   instead as a motion to compel, then I believe that would be a

23   possibility to say that the Court is --

24           THE COURT:  My concern --

25           MR. SWENSEN:  -- entitled to compel this and,              15:22:56

1   therefore, some fees are allowed.

2         THE COURT:  One of the cases that was cited in my

3   order -- the order setting the order to show cause -- hearing

4   to show cause was *Sali versus Corona Regional Medical Center*,

5   884 f.3d 1218.  That's a recent Ninth Circuit case where the        15:23:12

6   Ninth Circuit said that none of the sanctions available under

7   Rule 37 are available against nonparties.

8         So the way I read that, it seems like when you're

9   dealing with noncompliance with a Rule 45 subpoena, the usual

10  palette of options under Rule 37 aren't available, you're         15:23:32

11  really limited to contempt sanctions under Rule 45.

12        MR. SWENSEN:  Well, possibly.  But I don't believe

13  that it still requires a finding of contempt, because I believe

14  the Court is entitled -- the cases that I recall seeing talk

15  about using the $500 a day type sanction or other things to       15:23:52

16  purge the contempt, to get rid of the contempt.

17        And I think if the Court believes that the contempt

18  has been purged, by our actions and our payment, then I don't

19  believe that it's necessary to actually find us in contempt,

20  but rather say, contempt's been purged because you stepped up     15:24:17

21  and did this and you paid their costs.  And that's -- that was

22  your consequence for what happened.

23        THE COURT:  Okay.

24        MR. SWENSEN:  All right.

25        THE COURT:  Thank you.                                      15:24:29

1        Mr. Wurtzel, Mr. Meyers is coming to the podium right

2   now, so I'm still hearing from the Wilenchik parties.

3        MR. MEYERS:  Thank you, Your Honor.

4        MR. WURTZEL:  Thank you, Your Honor.

5        MR. MEYERS:  So I got pulled on this case on May 17th      15:24:49

6   as the ship was sinking or had almost fully sunk.

7        THE COURT:  Welcome.

8        MR. MEYERS:  So, yeah, I parachuted in last minute.

9        Since that time I just -- and Tyler covered a majority

10  of what I was going to say, so I won't reiterate that.  But    15:25:03

11  I'll just say, basically from the moment that this thing whole

12  got started, from the moment -- especially since I got

13  involved, we've done everything in our firm to get into

14  compliance as soon as humanly possible.  We've pulled every

15  shred of every paper that could possibly be responsive and     15:25:18

16  produced it.

17       To date we've produced 325 pages of documents, which I

18  think you've seen in maybe multiple filings now.  And let me be

19  clear, that's all we have, that's all we got.

20       We -- following our filing on the 22nd and our final      15:25:33

21  production on the 21st, we engaged in several more

22  communications with Mr. Wurtzel over the week.  And I think

23  largely those communications were like two ships passing in the

24  night.  We were just talking around each other.  I couldn't

25  figure out what he was trying to get at --                     15:25:49

—CV-17-4140-PHX-DWL – May 29, 2019—

1          THE COURT:  Let me ask you to slow down.  I'm a fast

2     talker as well.  But for the court reporter's benefit.

3          MR. MEYERS:  I apologize.

4          Yeah, so essentially after the 22nd, or maybe on that

5     same date, we had several communications back and forth with          15:26:01

6     Mr. Wurtzel.  Frankly we've been confused for the large part at

7     what he's still getting at.  Whatever it is, it's not in

8     documentation in our possession.

9          As Mr. Swensen indicated, our firm has a little bit of

10    an antiquated bookkeeping system.  We don't have online banking     15:26:20

11    access set up.  As a matter of fact, I was told that for a good

12    portion of this case we did something called mail -- banking by

13    mail, which is that our bookkeeper didn't actually set foot in

14    a bank.

15          So we're a little bit behind the times on that.  And I      15:26:36

16    think that's caused some of the issues that are still

17    lingering.

18          I just want to say to the Court, you know, from our

19    perspective, when it comes to production of documents --

20    because that's what a subpoena is at the end of the day,          15:26:48

21    response -- produce all responsive documents -- we've given

22    everything in our immediate possession.  And we're trying to

23    work with Mr. Wurtzel to figure out exactly what he wants.

24          He's produced this little grid document that I think

25    he attached in his appendix to the latest filing.  He sent that   15:27:03

1    to me on Friday the 24th, about five or ten minutes before we

2    spoke.  Frankly, it's still taking me time to figure out what

3    exactly that means.

4         But I just want to assure the Court that we've

5    produced everything in our possession.  We are working in good        15:27:22

6    faith with Mr. Wurtzel to try to come to a resolution on all

7    these issues as soon as possible.

8         And frankly, at this point we're going above and

9    beyond what we need to to technically be in compliance with the

10   subpoena.                                                             15:27:36

11        THE COURT:  Let me -- just on the grid.

12        MR. MEYERS:  Yeah.

13        THE COURT:  It seems pretty straightforward to me.  I

14   mean, he wants the account numbers that the checks from

15   Wyo Tech and Inductance were drawn from, and he wants the            15:27:49

16   documentation showing which client accounts and client matters

17   those funds were applied to once they got inside the Wilenchik

18   firm.

19        Is there some level of complexity I'm not

20   understanding?                                                        15:28:04

21        MR. MEYERS:  Well, the first issue is, is we weren't

22   really sure what he meant by source account.  And I think we've

23   had several back and forth about exactly what that means.

24        We figured out that -- and I think he can correct me

25   if I'm wrong -- but that is the account from which the check         15:28:13

1   itself was drawn, presuming that Wyo Tech or Inductance at some

2   point had more than one bank account from which they were

3   drawing checks and paying us.  So I think we've resolved that

4   issue.

5       At this point, to get the information that he's                    15:28:28

6   requesting on this grid, like I said, we don't have it, but

7   we're working on getting it.  And to get that, we're going to

8   have to pull the checks, which we've instructed our bookkeeper

9   to do, to just flat out get it.

10      Because when it was provided to us, these documents          15:28:41

11  were -- our clients redacted the -- effectively the source

12  account number on the check.  So we're going to have to go back

13  and kind of redo that.  But we're in the process of doing that.

14      Again, we're above and beyond what I think we're

15  technically required to do in compliance with the subpoena.      15:29:00

16  But in good faith cooperation and trying to remediate what has

17  happened here, we're willing to take that extra step to make

18  sure that happens.

19      That's about all I have.

20      I'd just like to say, I'd like to continue to talk to       15:29:11

21  Mr. Wurtzel to try and sort out all of these issues.  He raised

22  four new issues in the -- in his reply brief, which we

23  addressed in the surreply, where I think we screamed, we don't

24  have those checks with us right now and we can't get them.

25      So from that perspective I just want to reiterate to        15:29:30

1   the Court, we're technically in full compliance with the

2   subpoena.  And we're working with Mr. Wurtzel and I want to

3   continue to do so to get this ironed out as soon as humanly

4   possible.

5           THE COURT:  Okay.  Thank you.                    15:29:44

6           MR. MEYERS:  Thank you.

7           THE COURT:  All right.  Mr. Wurtzel.

8           MR. WURTZEL:  Thank you, Your Honor.

9           First of all, as a threshold matter I just want to say

10  that none of this -- there was some suggestion in the Wilenchik  15:30:01

11  & Bartness' surreply that this was -- I think the word they

12  used was a vendetta, that it's personal.  I want to assure the

13  Court that none of it is.

14          And we've had multiple matters in Federal Court and in

15  State Court with Wilenchik & Bartness, and I felt that we've    15:30:19

16  always exchanged professional courtesies that have gone both

17  ways, and we've always worked cooperatively, to the extent

18  possible.

19          And none of this is personal, and none of this is a

20  vendetta or anything like that.  What it is is that I have two  15:30:34

21  clients that are very, very unhappy because they've had to

22  spend a lot of money to get not even all the documents that

23  were requested in a very simple and short four requests

24  sufficient to show subpoena that we served almost four months

25  ago at this point.  And that the Court ordered compliance with  15:30:53

UNITED STATES DISTRICT COURT

1   two months ago.  And that was required to be complied with one

2   month ago.

3           I understand everything that my adversaries have said

4   regarding what led to the production being done in the way that

5   it was.  You know, I think the record speaks for itself.  I'm        15:31:13

6   happy to address any specific issues that the Court has.  But I

7   don't need to dwell on that.  And I think the Court can draw

8   its own conclusions and can take the explanations for what

9   they're worth.

10          You know, the one thing on that point is that, you       15:31:28

11  know, to hear that responses to -- that objections are being

12  drafted without having read the Court's order, you know, that's

13  particularly problematic to me, because then we get those

14  objections and we react in a certain way, acting under the

15  assumption that everyone involved in the case has read the       15:31:47

16  order that the Court has required them to comply with.  But

17  I'll leave it at that.

18          In terms of where we are at the moment with document

19  production, I agree that the Beus Gilbert firm has fully

20  complied.  And I think we put in our reply that they've fully       15:32:08

21  complied as of May 17th of 2019.

22          As far as Wilenchik & Bartness goes, there were

23  several things that we identified in our reply.  And they

24  weren't immediately raised in the reply, they were things that

25  we identified and we did have a meet and confer, and an          15:32:25

——— **CV-17-4140-PHX-DWL – May 29, 2019** ———

1    extensive phone call last week and a lot of emails, as the

2    Court has seen.  And I agree with the Court that what we've

3    identified as missing is actually very simple, and it's

4    reflected in the chart.

5          And I hear what opposing counsel is saying that they          15:32:39

6    don't have the documents in their possession, but that doesn't

7    mean that they don't have them in their control.  And if I

8    understand opposing counsel correctly, they didn't even try to

9    get these documents from their bank until a couple days ago,

10   which is already a month after the Court ordered them to comply    15:32:55

11   with the subpoena.

12         So to hear -- to hear that they didn't intend to

13   violate the order is fine.  It's fine for them to say that.

14   And, you know, the Court will take that for what it's worth.

15         But at a certain point the buck has to stop somewhere.       15:33:12

16   And we're in a situation where it's literally over a month

17   since the deadline for compliance and, you know, they just now

18   went to the bank to get the documents that are required to be

19   produced under the subpoena.

20         And respectfully, Your Honor, I do think that                15:33:32

21   documents that are in the possession of your bank, whether you

22   have online access or you have to go to the bank or call the

23   bank to send them to you, those are considered within your

24   control.  And then I think the case law supports that.  And it

25   doesn't even sound like the Wilenchik firm is substantively        15:33:46

1   disagreeing with that.

2          And then the second issue that we have, the second

3   real issue we have is that in this production the Wilenchik

4   firm produced a number of payments, you know, at least a dozen

5   if not more, that are labeled, you know, Danzik retainer                 15:34:05

6   payments or Danzik payments.

7          I asked them last week, I said, who made these

8   payments to you?  If these payments were made by Wyo Tech or

9   Inductance, which is all the subpoena required, then you have

10  to also give me the source account, the client, and the matter        15:34:23

11  for each payment.  If these payments were made by someone other

12  than Wyo Tech or Inductance, there's nothing further required,

13  you just included it in the production by mistake or

14  additionally, that's fine.

15         And the answer I got back was, we don't know who made      15:34:37

16  these payments.  I said, well, you have to know, you have to

17  figure it out.  Because if they were made by Wyo Tech or

18  Inductance, then you're missing information.  And you have to

19  be able to say one way or the other.

20         Mr. Swensen said this afternoon that those -- that he      15:34:52

21  believes those payments were made by Danzik Applied Sciences.

22  That's the first time that I'm hearing that.  What I heard from

23  Mr. Meyers last week was that they don't know who made those

24  payments.  The only way to know would be to look at the checks,

25  which I understand they're now doing.                                   15:35:10

1    So from our perspective, until they can tell us one

2  way or another whether these were made by Wyo Tech or

3  Inductance, in which case they have to produce this additional

4  information for each payment, or they can say these payments

5  were not made by Wyo Tech or Inductance.  Until one of those          15:35:25

6  two things happen, then the subpoena is not fully complied

7  with.  Because as far as I understood it -- and notwithstanding

8  Mr. Swanson's statement this afternoon, as far as I understood

9  from last week with emails and the long call that Mr. Meyers

10 and I had, they did not know one way or the other whether these      15:35:42

11 payments came from Wyo Tech or Inductance.

12    I think Mr. Wilenchik had even indicated in an email

13 that he thought they came from Wyo Tech or Inductance.  I don't

14 know if he was speaking from having knowledge or if he's just

15 making an assumption.                                                 15:35:59

16    But I think the subpoena requires them to find out,

17 what payments did we get from these two entities, and for each

18 payment provide this very limited information.  And to this

19 point we haven't gotten that.

20    So, you know, I think based on the record, you know,              15:36:13

21 it is clear that the subpoena for the Wilenchik firm has not

22 been complied with to date.

23    THE COURT:  You know, the way I understand things, I

24 think that there's two different categories of possibly still

25 outstanding discovery.                                                15:36:27

1          One has to do with the checks from the bank that have

2    not yet been recovered, that it sounds to me that Wilenchik has

3    agreed to go get.  Even though I know your position is that

4    they should have got them a long time ago.  Nevertheless, it

5    sounds like we're on a track to getting those within the next          15:36:44

6    couple of weeks.

7          The other category of discovery that is arguably still

8    outstanding has to do with internal invoices and documents from

9    within the Wilenchik firm showing how the money was applied and

10   what clients and client matters it was applied to.                     15:36:59

11          And I guess I want to hear more from you on that,

12   because as I read in the surreply they filed today, essentially

13   we've given you everything that's responsive, and to the extent

14   you may be frustrated that the documents we've given you aren't

15   clearer or more comprehensive, a Rule 45 subpoena just requires        15:37:18

16   us to give you what we've got.  It doesn't require us to create

17   previously nonexistent records that will help you understand

18   the flow of things better.  We've given you everything we've

19   got, and it's your burden now to figure out what they mean.

20          And they're the ones who would know what documents           15:37:36

21   they have and don't have showing how client payments were made.

22   So to me -- at least as to that latter issue, the documents

23   showing how the client funds were used, I'm struggling to

24   understand how I could find them still not to be in compliance

25   when they're representing that they've now given you                    15:37:55

1    everything.

2          MR. WURTZEL:  Yes, Your Honor.

3          So I agree, they're not required to create documents

4    that don't exist.

5          What I said to opposing counsel when we met and                15:38:06

6    conferred on this is that when a check comes in from Inductance

7    or Wyo Tech, it goes into their attorney escrow account.  And I

8    believe I heard Mr. Swensen say earlier this afternoon that the

9    account -- that the check would go to cover any one of several

10   matters.  And I said, that's fine.  If that's how you did it,       15:38:24

11   then produce a document that shows that that's what you were

12   doing.  Tell me what those five or ten or 20 matters were.

13         Obviously when they got a check, when it came into

14   their escrow, it didn't just go into the pot of all escrow

15   funds and -- without any further tracking.  It had to have         15:38:45

16   been -- there has to be a document -- there has to be some type

17   of tracking that shows this $100,000 check from Wyo Tech or

18   from Inductance just came in, and this will be applied to any

19   one of these, quote, Wyo Tech or, quote, Danzik matters.

20         That's all I'm looking for.  A document that shows           15:39:04

21   which matters and which clients it would be permissible to use

22   that retainer check for.  They haven't produced something like

23   that.

24         But obviously the bookkeeper, or whoever does the

25   billing, knows to apply it to certain matters.  And this is        15:39:17

UNITED STATES DISTRICT COURT

1    relevant to the case because our argument is that these checks

2    from, you know, Inductance and Wyo Tech came in, and they're

3    being used in part for this matter, but they're also being

4    used, in part, for Danzik and labeled as Danzik crony or Danzik

5    family matters.  And if that's the case, then I want to know          15:39:40

6    that.

7         And what we've -- and I actually explained this to

8    Mr. Meyers when we spoke last week, I gave him an example of,

9    you know, payments in which they had produced all of the

10   relevant documents.  And I think I gave him the example of            15:39:53

11   either the January 22nd or the August 17th, and one of those

12   two, I walked him through and I explained how they had given

13   everything that shows -- you know, that shows the payment

14   coming in, it showed who made the payment and what account it

15   came from, it shows the amount of the payment.                       15:40:12

16        And then I showed him another document that Wilenchik

17   & Bartness produced that showed that payment on their accounts

18   receivable ledger applied to a particular matter, or a

19   particular client, or maybe -- you know, I think the example

20   was the January 22nd one was for Danzik slash ADZ CWT, which I       15:40:30

21   said to him I thought that was acceptable, because in that

22   instance I can see who the client is and who the matter is.

23        And maybe it's the case that I think Danzik ADZ, which

24   I'm assuming means against or adverse, to CWT, maybe that means

25   one matter, maybe it means multiple matters, and that's             15:40:54

1    something that can be clarified in a deposition or otherwise.

2          But for purposes of the subpoena, I explained that

3    that satisfies it.

4          But for some of these other payments, when the

5    only -- when the only documents related to some of these other        15:41:06

6    payments are documents that were produced by Wyo Tech, for

7    example, the April 9th, 2018 payment, or the August 21st, 2018

8    payment -- I'm looking at the appendix A, which is docket

9    number 153 at page 10 of 11.

10         You know, these are payments that Wilenchik & Bartness        15:41:24

11   didn't produce any documents for.  The only reason we know

12   about these are, A, because we had checks, you know, from other

13   postjudgment discovery that showed them.  And when we

14   asked -- after we attached them to our motion papers, Wyo Tech

15   produced some version of these checks.        15:41:44

16         And then Wilenchik & Bartness, in its supplemental

17   written responses, cited those documents in the Wyo Tech

18   production and said, here are additional documents that we

19   don't have, that we got from our client that are responsive.

20         So my followup is, well, for other payments for which        15:42:01

21   you had responsive documents, you did in many instances give me

22   documents that showed where these payments -- how these

23   payments were applied, or at the very least how they were

24   earmarked in the escrow account.  But for these other payments,

25   you know, we didn't get that.        15:42:18

1       So I understand they're saying we don't have anything

2   more.  They said that before and it turned out that they did.

3   And now they're saying that again.  And I'm pushing back

4   because I just can't understand how a law firm could accept

5   payments into its escrow account without having a single piece      15:42:37

6   of paper or document that says, this $100,000 escrow payment is

7   to be used for this client or for these ten clients or these

8   ten matters.

9       THE COURT:  Okay.  I want to ask you a couple of

10  questions related to the one I asked earlier about -- so first,    15:42:54

11  what is your estimate, if there were some sort of an award, for

12  the briefing costs that you've had to incur because of the

13  things that have gone on here?  Do you have any even rough

14  sense of that?

15      MR. WURTZEL:  Without -- I would have to look.  I           15:43:13

16  mean, probably in the neighborhood of $25,000.  Maybe a little

17  less, a little more.

18      THE COURT:  And a different question I have is the

19  question I asked earlier, are you -- you know, I am struggling

20  with whether or not there's a evidentiary foundation to make      15:43:32

21  all the findings that will be required for contempt.  And

22  I'm -- the question I have to you is, outside of a

23  filing -- finding of civil contempt under Rule 45, are you

24  aware of any other legal mechanisms that would authorize me to

25  award you the reasonable costs you incurred in briefing some of    15:43:50

—— CV-17-4140-PHX-DWL — May 29, 2019 ——

1   these things?

2        MR. WURTZEL:  You know, I think the Court could

3   probably impose sanctions.  It wouldn't be Rule 37 sanctions,

4   but there are other -- the Court has inherent authority to

5   impose sanctions.  I haven't researched, at least not recently,   15:44:05

6   whether that applies to nonparties.  But from what I recall,

7   that is very broad, the Court's inherent authority.

8        So if the Court was reluctant to impose -- to make a

9   contempt finding, but wanted to award some type of sanctions,

10  which, you know, again, we're not looking -- you know, if the   15:44:25

11  answer is that we get our attorney's fees and some type

12  of -- something to compensate my clients for what we've had to

13  go through, whether it's a contempt finding or not, is less

14  significant to me.

15       I think the Court probably could do it using its   15:44:42

16  inherent authority to control discovery and its inherent

17  authority to sanction parties before it for discovery conduct.

18       THE COURT:  All right.  And then, you know, a

19  different matter that's pending out there is, one of the

20  requests that you had made as part of the civil contempt   15:44:58

21  finding was a requirement of a $500 daily fine starting on

22  April 27th until compliance has been completed.  I guess I want

23  to hear more from you on that.

24       I will let you know my tentative view is that doesn't

25  strike me as something that's appropriate here.  Because my   15:45:14

1    reading of the papers that have been presented and the argument

2    here in court today is that the Wilenchik firm is –– although

3    they made a lot of mistakes earlier, they're scrambling in good

4    faith to try to comply right now.  And it's not clear to me why

5    daily sanctions are needed on top of that, given what appears            15:45:34

6    to be me to be belated but good faith attempts to comply.

7        MR. WURTZEL:  Well, Your Honor, I appreciate that.  I

8    mean, you know, the issue that I have is that we're going to be

9    getting –– you know, it's a month after the production

10   deadline.  It sounds like we're not going to get a full                  15:45:50

11   production for another few weeks.  You know, so I'm not sure

12   that a –– some incentive to do this faster, you know, would

13   not, A, encourage it to get done faster, and B, you know,

14   impose some type of penalty for waiting until a month after the

15   production deadline to first go out and get the documents from           15:46:13

16   the bank.

17       You know, that being said, ultimately, you know, we're

18   not looking to cause pain here.  I mean, Wilenchik is a law

19   firm for a party, but ultimately a nonparty.  I think we would

20   be satisfied if we were able to get our attorney's fees                  15:46:32

21   incurred in having to, you know, engage in all the motion

22   practice related to the contempt and to do this hearing, and

23   then the back and forth with opposing counsel, you know, since

24   we filed the contempt motion.

25       If the Court is struggling with, you know, whether to                15:46:51

1    impose the daily fine, given the belated good faith, it would

2    have been nice to see the good faith earlier on rather than

3    just sending out discovery responses and seeing whether I

4    complained about them, and only after I complained about them,

5    you know, making an effort.  To me that actually is a reason to          15:47:08

6    impose some additional sanction.

7           But ultimately we're not -- the amount in

8    sanctions that are -- what I'd like be able to tell my clients

9    is that you're being made whole for having to go through this

10   process.                                                                 15:47:26

11          THE COURT:  All right.  Thank you.

12          Is there anything else you'd like to add?

13          MR. WURTZEL:  No, Your Honor.

14          THE COURT:  All right.  Mr. Swensen?

15          MR. SWENSEN:  Thank you, Your Honor.                              15:47:39

16          I'd just like to point out, the core issue in this

17   case, and I think we've got pretty far afield from it, is the

18   $600,000 that -- or approximately $600,000 that were interpled,

19   and whether or not CWT as a judgment creditor has any kind of a

20   claim to those funds.                                                    15:48:01

21          What Wyo Tech or Inductance may have paid to Wilenchik

22   & Bartness is at best conditionally relevant, assuming several

23   dots can be connected.

24          This is not information that is just absolutely core

25   and crucial.  I think the Court actually recognized that.               15:48:23

1      THE COURT:  I'll keep hearing you out on that but, I

2   mean --

3      MR. SWENSEN:  I just want to make that clear.

4      And we have provided already -- or our clients have

5   provided some 30 plus affidavits or declarations from the          15:48:33

6   various investors in these companies stating unequivocally that

7   that money that they've invested in the Wyo Tech and Inductance

8   is their money, has nothing to do with Dennis Danzik or RDX,

9   the judgment debtors.

10      We are trying to address the core issue in this case.       15:48:56

11   And we understand we messed up, and we need to fix it.  But we

12   do take issue with the statement by Mr. Wurtzel that, A, we

13   haven't complied, because we have.  B, that we have control

14   over bank records that have to be physically located and

15   retrieved by the bank once we give them the information that     15:49:22

16   we're looking for.  We don't have very much control over that

17   or how long that process takes.

18      You know, I don't have a case citation to that point,

19   but I think it's pretty far afield from the case that they

20   cited where Vince McMahon had online banking and all he had to   15:49:38

21   do was push a couple of buttons and bring his records up.

22      THE COURT:  Well, that issue isn't fully briefed.  I

23   haven't done any independent research.  But my initial thought

24   when I read it is, it makes 100 percent sense to me that you

25   have control over your bank records, even if they happen to be   15:49:56

1    at the bank, in the same way that subpoenaed documents, if you

2    happen to be storing them at lawyer's office, you still have

3    control over them.

4        So I'm not that persuaded by your argument you don't

5    have control over your own financial documents at your bank.      15:50:10

6        MR. SWENSEN:  Well, maybe I'm not expressing it

7    clearly enough.  But the point I'm trying to make is, we don't

8    have control over how long that process takes.  We can't go

9    down to the bank and say, just let me in your back room and

10   I'll go through the files myself, in that sense of control.        15:50:26

11       And it goes to the issue of the $500 a day sanctions.

12   But I believe the Court's already kind of resolved that's not

13   going to be a motivator to get things moving any faster,

14   because we don't have any control over how long it takes the

15   bank to pull these things.                                         15:50:44

16       THE COURT:  Right.

17       MR. SWENSEN:  Okay?

18       And the last point is that, you know, we have complied

19   to the best of our ability to date on these things.  And we've

20   given everything in our possession and control, other than        15:50:55

21   those checks.

22       THE COURT:  So the question I have -- I think that I

23   have a pretty good understanding of the checks.  With respect

24   to the internal documents within your firm showing how Wyo Tech

25   or Inductance funds were applied to different client matters, I    15:51:08

1   don't know, you guys are the only ones that have personal

2   knowledge of how your internal accounting processes are set up.

3   But I will say, I tend to share Mr. Wurtzel's skepticism of the

4   idea that a $100,000 retainer check could come into your firm

5   and there could be zero paperwork anywhere showing who gets                    15:51:26

6   credit for that or what client matters it subsequently got

7   applied to when you were working on it.

8          MR. SWENSEN:  And, you know, I had my own skepticism

9   about that until I had it explained to me by Miss Loftis.  And

10  she does keep track of all this.  And she has a way -- I even      15:51:44

11  asked her, I said, okay, so what happens if a client calls up

12  and says, how much money do I have left in my retainer account

13  in your trust account?

14         And the way she does that is to go and take the

15  documents that we supplied, and to subtract amounts paid to        15:51:58

16  other slips of paper or ledgers that she has that shows money

17  coming in, and says, okay, based on these two figures this is

18  what you've got left.  She literally goes through that process.

19  It's not written down anywhere.

20         And as much as Mr. Wurtzel doesn't accept that, the          15:52:18

21  offer was made by Mr. Wilenchik to him to say, look, I'll have

22  Miss Loftis speak to you directly, and she can explain it to

23  you and answer your questions.

24         But that's the way it is.

25         And so there's nothing more we can say, other than           15:52:32

1   we've given him all the documentation that's out there.  And if

2   he wants to depose Miss Loftis and ask her those questions,

3   fine.  But we've offered to actually try to fill in the blanks

4   and say, let me try to explain this to you, this goes here and

5   this goes here.  And it's like it's -- there's no pleasing him                    15:52:48

6   at certain point.  He just insists that there must be more.

7   There isn't.

8           That's all we can say, there isn't anymore.

9           THE COURT:  Do you think -- do you agree with

10  Mr. Wurtzel's view that outside of Rule 45 I have inherent                        15:53:03

11  authority to order reasonable compensation for attorney's fees

12  here without making a contempt finding?

13          MR. SWENSEN:  Yes, I believe the Court has inherent

14  power to -- yeah, to hold a party responsible for costs

15  incurred by another -- or a nonparty, hold a nonparty                             15:53:23

16  responsible for costs incurred by a party in this situation.

17          THE COURT:  All right.  Is there anything else you'd

18  like to add?

19          MR. SWENSEN:  Anything else?

20          No.                                                                       15:53:36

21          THE COURT:  All right.  I'm going to take five minutes

22  to go back in chambers and think about this, and then I'm going

23  to come out and make a ruling.

24          So we're temporarily adjourned.

25          (Recess at 3:54 p.m., until 4:05 p.m.)                                    15:54:01

1          THE COURT:  All right.  Mr. Wurtzel, are you still

2     there?

3          MR. WURTZEL:  Yes, Your Honor.

4          THE COURT:  Okay.  I've considered all of the argument

5     and the briefing that's been provided in this case, and I make          16:06:00

6     the following rulings:

7          The first matter to address is whether the Wilenchik

8     firm and Beus Gilbert should be held in civil contempt based on

9     the matters that are before the Court.

10         Everybody agrees that Beus Gilbert shouldn't.          16:06:15

11         With respect to the Wilenchik firm, I decline to make

12     a contempt finding.  Even though, as the reasons I'll get into

13     in more detail in a little bit, I find that a lot of the

14     conduct here was negligent and there are a lot of mistakes that

15     could have been avoided, ultimately I'm in agreement with and          16:06:32

16     I'm persuaded by the statements that were made in Mr. Swensen's

17     brief that was filed last week and in court here today, that

18     what occurred here was the product of negligence coupled with

19     several unusual factors that were unanticipated; the loss of

20     two associates from the firm, and the terrible personal news          16:06:52

21     that Mr. Wilenchik's family has gone through.

22         And those things, rather than any bad faith or intent

23     to mislead, explain what has occurred here.

24         So, I do not find that a contempt finding is warranted

25     here.          16:07:07

1          My principal concern is what to do to make sure that

2   this subpoena is now complied with so we can move forward in

3   the case.

4          There are two categories of discovery that are

5   outstanding here, or at least in dispute.  One are the checks,          16:07:18

6   and two are the client records showing where the money went.

7          With respect to the checks, I am persuaded by

8   the -- on the one hand, I'm persuaded by the CWT parties that

9   these are things that should have been provided all along, they

10  are in the control of the Wilenchik firm.  But that's sort of a          16:07:40

11  moot issue because the Wilenchik firm has agreed to provide all

12  these things.

13         And again, my principal concern here is just making

14  sure that the discovery gets provided, not casting blame at why

15  the process has broken down earlier.          16:07:53

16         The Wilenchik firm has represented that they think

17  they can have all the checks within three weeks.  I don't want

18  to cut it too close, so I'm going to order that within a month

19  all of these checks get obtained and provided.

20         And I just want to be as clear as possible, that if          16:08:07

21  they are not provided in a month, the CWT parties are free to

22  file further motions, and I will look upon those motions

23  favorably.  Because this has already gone on way too long,

24  these things should have been provided a long time ago.

25         With respect to the accounting records, at the end of          16:08:23

1   the day -- you know, Mr. Wurtzel expressed skepticism that

2   there are no records showing where six figure retainers went

3   after they came into the firm.  I then expressed that

4   skepticism --

5          Mr. Wilenchik.                                16:08:40

6          MR. WILENCHIK:  I just want to be clear on this, if

7   there's some misunderstanding.  When you say "where they went,"

8   the client would direct that money to be placed into a trust

9   account that's maintained by the firm.  So we do know where it

10  went.  I just want to be clear on that.               16:08:54

11         THE COURT:  Right.  I understood that.

12         MR. WILENCHIK:  There's no designation by that client

13  when they send that money in, other than it will be applied to

14  all outstanding matters.

15         That's all I wanted to say.                    16:09:05

16         THE COURT:  Thank you for the clarification.

17         I guess, like Mr. Wurtzel, I was initially skeptical

18  that a firm wouldn't have more documented paperwork internally

19  showing after the money comes in how it gets allocated between

20  those accounts, and documentation in a form that could be   16:09:20

21  provide as discovery.

22         Mr. Wilenchik.

23         MR. WILENCHIK:  We do.  And we had provided that a

24  long time ago.  What it is, very quickly, is -- and I don't

25  think it was explained very well.  She sent, and they have   16:09:30

1   copies of all invoices.  On those invoices for the matter it

2   shows how the money was applied.  And it can be easily

3   calculated.  So I'm not sure what the issue here is.

4              THE COURT:  Okay.

5              MR. WILENCHIK:  Thank you.                          16:09:43

6              THE COURT:  I understand.

7          And that, I guess, goes to the bottom line point I was

8   going to reach on this issue, is at the end of the day there's

9   only one party that has the foundation to make a representation

10  on whether it's complied with the subpoena, and that's the     16:09:55

11  Wilenchik firm, because they're the ones who are familiar with

12  their accounting systems and how they track funds internally.

13  They've represented that they've complied with the subpoena.  I

14  accept that representation.

15          I just will further note that, again, I see a world     16:10:08

16  where in later stages of this case there might be depositions

17  from folks within the firm about how the accounting system

18  works.  So, this record should be crystal clear that I'm making

19  rulings made on point-blank representations to me how the

20  accounting system works.  If these representations turn out to  16:10:26

21  be inaccurate, that will be a big problem.  But I accept what

22  you've said.  And given that, I don't think that there's

23  anything else for me to compel with respect to these accounting

24  issues.

25             MR. WILENCHIK:  I've offered to have my assistant,   16:10:37

1    without a deposition, speak with Mr. Wurtzel previously.

2              THE COURT:  I appreciate that.

3              So what I've covered thus far is, I don't find there's

4    a need for a contempt finding.

5              I think that we've cleared up prospectively what needs        16:10:49

6    to be done to ensure that the subpoena is complied with.

7              And so in my mind the remaining issue that needs to be

8    resolved is what happens to -- for purposes of sanctions or

9    otherwise to compensate the CWT parties for what they've gone

10   through thus far.                                                       16:11:07

11             And before I get into that, I guess I want to make

12   crystal clear that I do find that CWT is the aggrieved party

13   here who rightfully came to the Court for relief.  They

14   shouldn't have to wait this long for the discovery.  They

15   shouldn't be having to wait another four weeks for the checks.         16:11:23

16   They shouldn't have been the ones that received the unilateral

17   date limitation and had to come -- and had to address it.

18             So even though, as I stated earlier, perhaps not all

19   of the motions needed to be filed right away, there could have

20   been better meet and confer efforts, I don't want those                16:11:39

21   statements to detract from the bottom line conclusion that the

22   reason we're here -- and again, the Wilenchik firm has

23   admirably taken responsibility and accountability for the

24   mistakes.

25             Mr. Swensen, I know that writing that brief last week        16:11:54

1    and coming up here in court today, it's not fun.  No lawyer

2    wants to do that.  And I appreciate that.

3            But nevertheless, the fact that I'm ruling the way I'm

4    ruling shouldn't in any way suggest that CWT did something

5    wrong here.  They're the ones that were entitled to this          16:12:10

6    discovery a long time ago, and I'm just trying to make sure

7    they get it.

8            Because -- so the two forms of sanctions -- or civil

9    contempt sanctions that were previously discussed were daily

10   fines and compensation for attorney's fees.                        16:12:27

11           I don't find that daily fines are appropriate here.

12   The law is very clear that daily fines are not meant to be

13   punitive, they're meant to prompt the noncompliant party to

14   come into compliance.

15           I don't find that further prompting is necessary here,     16:12:41

16   because the Wilenchik firm has been adequately prompted, and it

17   strikes me that they're doing everything they can now to get

18   into compliance.

19           But with respect to the fees that the CWT parties have

20   been required to incur, I find that that's something that I        16:12:55

21   need to pay closer attention to.

22           I discussed on the record earlier what basis I might

23   have to impose sanctions.  And everybody agreed that even

24   though I haven't made a civil contempt finding, I have the

25   inherent authority to award sanctions under these                  16:13:12

1    circumstances.

2          The question then comes, how much of a sanction?

3          Mr. Wurtzel, I know it wouldn't be fair to you to have

4    a precise number on the tip of your tongue, because this is

5    just coming up.  You had given an estimate of $25,000.  That        16:13:25

6    seemed high to me.  I recognize that you've had to put in

7    significant work on this.  But $25,000 for this dispute seems

8    excessive, particularly because, as I mentioned earlier, I

9    think that perhaps some but not all of the motions practice

10   could have been avoided.                                            16:13:46

11         Where I'm at is ultimately this:  My rough sense is

12   that sanctions of no more than $10,000 would be appropriate

13   here to provide reasonable compensation for the fees that CWT

14   has incurred.  However, I can't -- as I'm sitting here right

15   now I don't feel comfortable picking a number out of the air       16:14:04

16   and imposing it, because I don't have the documents before me.

17         So how I'd like to proceed it this:  I would like the

18   parties to meet and confer before filing further briefing with

19   the Court about the amount of fees that ought to be awarded,

20   taking into account the comment I just made that I view $10,000    16:14:21

21   as the ceiling of what would be reasonable here.

22         If you can work it out without requiring further

23   briefing, that's fine, you can work it out and I don't need to

24   see anything further.  If you can't work it out, then CWT

25   parties are invited, after the meet and confer process, to file    16:14:39

 1   a motion seeking sanctions on the basis that I just stated.

 2          For purposes of how such a motion should look, my

 3   standard case management order is available on the Court's

 4   website.  I believe I also issued in this case -- in this case

 5   after it was reassigned to me by Judge Tuchi, but I just am not     16:15:01

 6   certain, but in any event that lays out some procedural

 7   requirements on how a motion seeking attorney's fees should be

 8   structured.

 9          Again, I am hopeful that we won't even need to get to

10   that point, because after the parties meet and confer they can     16:15:18

11   work it out.  But in case it needs to go there, the process is

12   laid out.

13          I think that's everything I needed to address.

14          From the Wilenchik parties' perspective, is there

15   anything I haven't addressed yet?                                   16:15:31

16          MR. WILENCHIK:  No.  And thank you for the sympathy.

17          THE COURT:  Thank you.

18          Mr. Wurtzel?

19          MR. WURTZEL:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you very much.  This           16:15:37

21   hearing is adjourned.

22          MR. TAYLOR:  Your Honor, just one quick question.

23          THE COURT:  Yes.

24          MR. TAYLOR:  Assuming we do work it out with the

25   Wilenchik firm, how should we notify the Court of that?            16:15:45

1          THE COURT:  I don't think you need to notify me.

2          MR. TAYLOR:  I understand.

3          THE COURT:  If you'd like to, you can file a notice,

4    but I don't even feel the need necessary that there needs to be

5    a notice.                                                              16:15:56

6          MR. TAYLOR:  I understand, Your Honor.  Thank you.

7          THE COURT:  All right.  This hearing is adjourned.

8       (Proceedings concluded at 4:15 p.m.)

9

10                              -oOo-

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV-17-4140-PHX-DWL – May 29, 2019

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 3rd day of June,

15   2019.

16

17

18

                          s/Candy L. Potter_____
19                        Candy L. Potter, RMR, CRR

20

21

22

23

24

25